In re Richard Lee **ELLINGSWORTH** and Deborah Ann **Ellingsworth,** Debtors.

**AT & T UNIVERSAL CARD SERVICES, Plaintiff,**

v.

Deborah Ann **ELLINGSWORTH,** Defendant.

Bankruptcy No. 96–61676. Adversary No. 97–6018.

United States Bankruptcy Court, W.D. Missouri, Southern Division.

Aug. 26, 1997.

**328**

Amy Ginsberg, Muller & Muller, Kansas City, MO, for Plaintiff.

James R. Doran, Springfield, MO, for Defendant.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

AT & T Universal Card Services (UCS) filed this adversary proceeding to determine the dischargeability of its debt against Chapter 7 debtor Deborah Ann Ellingsworth. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find the debt to be dischargeable in part and nondischargeable in part.

## FACTUAL BACKGROUND

Ms. Ellingsworth and her husband filed their joint bankruptcy petition on November 25, 1996. According to their bankruptcy schedules Ms. Ellingsworth was indebted to UCS for the sum of $4,038.11 at the time of filing. UCS issued a pre-approved credit card to Ms. Ellingsworth on October 19, 1995, with a credit limit of $4000. Ms. Ellingsworth did not use the card from the time it was issued until September 11, 1996. Between September 11, 1996, and October 15, 1996, she took 16 cash advances totaling $3411, and she made 8 purchases totaling $500.91. She made no payments to UCS before she and her husband filed their bankruptcy petition. Ten cash advances, totaling $2,058, excluding finance charges, were taken within 60 days of the bankruptcy filing. According to Mr. and Mrs. Ellingsworth's bankruptcy schedules, they had a total of $70,445 in unsecured debt at the time of filing. The vast majority of that debt is from 18 different credit cards.

A trial was held on July 28, 1997. At the trial Ms. Ellingsworth testified that she is employed as a special education teacher, and has been so employed for 18 years. Her net monthly income is $2,111.48. She stated that she and Mr. Ellingsworth began to depend on their credit cards to make ends meet six years ago, prior to the birth of their third child. They had always been able to make the minimum payments on the credit card accounts, but eventually they began to max-out one card and shift to another. She claims they always believed they would be able to get out of debt, and they had never contemplated bankruptcy. They believed Mr. Ellingsworth was being groomed for a job promotion, but in August of 1996 he was demoted from a buyer to an assistant manager. While his salary declined by approximately $200 a month, the real decrease was in benefits. The company had supplied him with a car, insurance, and a gas allowance when he was a buyer. There was also the potential for a bonus each year as a buyer. As an assistant manager, Mr. Ellingsworth had to provide his own transportation necessitating the purchase of an automobile. His net monthly income is $1,186.69.

The Ellingsworths apparently began to use the UCS credit card when they encountered these additional expenses. Ms. Ellingsworth also testified that the cash advances she made with the credit card were to pay for food, medicines, and clothing. She referred to medical expenses for three children, but she admitted she had health insurance, and offered no documentation for money she claimed was paid for doctor's visits and medications. She said that at the time she began using the UCS card all of her other credit cards were at their limit. She also said that on October 15, 1996, after the last cash advance, she stopped using the card and made an appointment with Credit Counseling Services in order to develop a plan to get out of debt. I note that she was over her credit limit on the UCS card at the time she claims she voluntarily stopped using it. She stated that until she and Mr. Ellingsworth met with a counselor at Credit Counseling Services she had never contemplated filing for bankruptcy. They only filed their petition when they were told that they were in too much debt to benefit from counseling.

Don Carter, an employee, testified on behalf of UCS. He admitted that UCS contacted Ms. Ellingsworth in 1995 and informed her that she had been pre-approved for a card. She responded by telephone and was

sent a credit card and a Universal Bank Credit Agreement (the Agreement). She never filled out an application for the card. Apparently she only verified by phone her income and employment. She was not asked about other liabilities. According to her bankruptcy schedules and the credit bureau report admitted at the trial, Ms. Ellingsworth and her husband already possessed at least 16 credit cards when she was offered the UCS card. Mr. Carter stated that UCS pre-approved Ms. Ellingsworth for its card based upon a credit score it obtained from a credit bureau. He stated that UCS obtained a Fair, Issacs Credit Bureau Score (a FICO score) of 759 on Ms. Ellingsworth prior to issuing her the card, and that any score above 680 merits consideration for a pre-approved card. He stated that UCS has developed some internal indicators that it uses in addition to the FICO score, but he was not certain of how the internal analysis is performed. And, other than the FICO score and the information provided by the customer as to her income and employment, it appears UCS had no other information available to it prior to issuing the card. According to Mr. Carter, once a card is issued to a customer, it is UCS policy to obtain a FICO score not less than every quarter, and to consider raising or lowering the credit limit or revoking the card, based on any changes. He said full credit bureau reports are not obtained prior to issuing cards because analyzing the credit bureau report itself would be too time consuming.

Mr. Carter testified that a full credit bureau report was generated on Ms. Ellingsworth on July 2, 1997, in preparation for this trial. That report showed her various obligations in detail. A casual reading of the report indicates that Ms. Ellingsworth is insolvent and unable to meet her obligations. UCS did not present any evidence that a quarterly credit score had been obtained on Ms. Ellingsworth between October of 1995, when she received the card, and July 2, 1997, when the credit bureau report was obtained.

UCS claims that Ms. Ellingsworth represented with each purchase and cash advance

that she had the ability and the intent to repay her obligation to UCS. It also claims that any cash advances she took within 60 days of the bankruptcy filing aggregating more than $1000 are presumed nondischargeable.

## DISCUSSION

### A. Introduction

The dischargeability of credit card debt is but one small piece in the puzzle that represents unsecured lending today because the use of credit cards is, in fact, a form of unsecured lending. The following scenario illustrates this point. Assume you are a loan officer for a large metropolitan bank. A woman walks in one day and says she wants to borrow $60,000 on her signature. She willingly fills out a financial statement which shows that she already has $300,000 in unsecured debt, but she needs these additional funds for a business trip. She also shows one asset, a heavily encumbered apartment building that is being foreclosed. Of course, she promises to repay the loan if one is made to her. Would a bank that makes such a loan be found to have justifiably relied on her promise? Of course not. But, what if, instead, the bank made the loan without bothering to ask her basic information about assets, liabilities, and income? And what if she did not make an express promise to repay the loan? Should this bank be allowed to claim that it justifiably relied on her implied promises to pay? One would think not. However, those are the very facts of a recent bankruptcy opinion, except that rather than a face to face encounter with a bank officer, the debt was incurred through use of a credit card.[1] In *In re Hashemi* the debtor used his American Express Card to run up over $60,000 in debt while vacationing in France with his family. Dr. Hashemi then came home and filed for bankruptcy protection. The Ninth Circuit held that the debt was nondischargeable. The opinion pays scant attention to whether American Express acted justifiably in relying on debtor's promise to pay, whether express or implied. The Court

---

1. *American Express Travel Related Services Co., Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122 (9th Cir.1997), *cert. denied*, —— U.S. ——, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997).

found only that when Dr. Hashemi began his spending spree his account balance was $227.00, and that he had often repaid balances in excess of $60,000 in the past.[2] Nonetheless, surely if American Express had been aware of Dr. Hashemi's current situation, it would not have extended the credit. And, if it was not aware that Dr. Hashemi was insolvent, then it should have taken some steps to find out before extending such a large amount of credit. If no lender would have made that loan in a face to face transaction, why are American Express' unreasonable lending practices afforded special protection under the Bankruptcy Code? Is there something in the Bankruptcy Code that treats credit card loans differently from face to face loans? Congress has created certain presumptions of nondischargeability as to credit card debt.[3] To the extent those presumptions are applicable, a portion of Ms. Ellingsworth's debt is nondischargeable. However, to the extent there is not a presumption of nondischargeability, the conduct of UCS in making credit available to her is a significant factor, which renders that portion of her debt dischargeable. I begin with some background regarding the explosive growth of pre-approved credit cards. I then find that UCS cannot justifiably rely on any representation made by Ms. Ellingsworth when UCS issued a pre-approved card to her unless UCS first obtained information as to her assets, liabilities, income, and expenses, and periodically updated that information. However, I also find that Ms. Ellingsworth did not intend to repay her obligation to UCS at the time she made the charges and took cash advances on the card. Finally, I find that Congress did intend to treat credit card cash advances differently from other credit card transactions if taken within the presumption period of 60 days prior to the bankruptcy filing. Therefore, to the extent any cash advances fall within the presumption period, I find that these debts are nondischargeable even though UCS did not prove justifiable reliance. To the extent the charges and cash advances were taken outside the presumption period, the lack of justifiable reliance requires a finding of dischargeability.

### B. The Growth of Credit Card Use

In 1995 2.7 billion unrequested solicitations for credit cards were mailed to American consumers.[4] That amounts to about 17 offers per adult.[5] The average card has a spending limit of $6007, therefore, if a consumer accepted every offer, she would end up with a potential credit line of $102,119.[6] And, while the industry average for charging off credit card debt is 6 percent,[7] bank profits have hit the highest levels in more than half a century, thanks primarily to the profits from credit cards.[8] The average household carries about $4000 a month in card debt, a total of $367 billion, and banks earned approximately $35 billion in interest on this total in 1995.[9] Since credit cards are so profitable, and the profits derive from having a very large customer base, issuers such as UCS may choose to ignore the usual standards of credit worthiness. Additionally, the creditors actively seek out undisciplined spenders who carry large unpaid balances from month to month. They dangle large credit lines in front of these consumers, and offer come-ons like lower interest rates for the first few months, as well as pre-printed cash advance checks.[10] Some banks have even started to penalize consumers who pay their accounts in full each month.[11] In their

---

2.  *Id.* at 1126.

3.  11 U.S.C. § 523(a)(2)(C).

4.  Chris Woodyard, *Consumers in Debt: A Sinking Feeling*, Houston Chronicle, October 14, 1996, at A NEWS.

5.  *Id.*

6.  *Id.*

7.  "MBNA" Rating Downgraded Credit Card Debt Risk Cited, Bangor Daily News, April 26, 1997.

8.  Chris Woodyard, *Consumers in Debt: A Sinking Feeling*, Houston Chronicle, October 14, 1996, at A NEWS.

9.  Lauri Hayes, *Credit Card: Banks' Marketing Blitz Yields Rash of Defaults*, Wall Street J., Sept. 25, 1996, at B1.

10.  *Id.*

11.  *Id.*

eagerness to capture market share, banks spend little time gathering financial information about their potential credit card customers. Prior to a mass mailing, creditors such as UCS obtain lists from credit bureaus with the names of candidates and a "credit score" for each person on the list. These scores relate generally to past card use, whether the candidate pays the minimum monthly balance on current cards, and whether there are any delinquencies or bankruptcies on record. Car loans, medical bills, and mortgages are not included in the credit score, nor are income, job history, marital status, and assets.[12]

The credit score, which can range from 450 to 850, is a supposedly scientific way of assessing the likelihood that a debtor will repay a loan.[13] The computer credit model upon which most lenders rely today was developed by Fair, Issacs, and Company in California.[14] The score is based on all credit-related data in a credit bureau report, but it is not a measure of a borrower's income, assets, or bank accounts.[15] Fair Issacs, which is the service that UCS uses, identifies credit patterns, each of which corresponds to the probability that a lender will make payments.[16] Supposedly the information used in calculating a credit bureau risk score includes: (1) payment history; (2) public record and collection items; (3) delinquencies; (4) outstanding debts; (5) number of balances; (6) average balances across all trade lines; (7) relationship between total balances and total credit limits; (8) credit history; (9) age of oldest trade line; (10) applications to obtain additional credit; (11) number of applications and account openings; (12) time between applications; and (13) types of credit in use.[17] A credit score is a "snapshot of an individual's changing credit history." [18] The items

are updated monthly, so the scores will change with new information. By Mr. Carter's own admission it is more efficient for UCS to rely on a credit score than to acquire specific information about a potential customer prior to offering that customer a credit card. In other words, as long as you use a credit card instead of a financial statement to obtain an unsecured loan, you do not have to indicate any form of credit-worthiness, other than the fact that, until now, you have paid your bills on time. Unfortunately, this tactic guarantees that borrowers who are encouraged to use credit cards until they acquire unsecured debt that far exceeds their income will ultimately not be able to pay their bills on time.

Banks use other techniques as well to encourage consumers to keep large balances on their credit cards. For example, VISA and MASTERCARD issuer Citibank offer credit cards that give a 2 percent interest rate break to customers who keep a balance of more than $2,500. UCS, the plaintiff here, rewards customers with bonus points if they carry a large balance.[19] More disturbing, credit card companies flood college campuses with sign-up tables to hook customers early in adulthood. It is not unusual for college students with no income at all to accumulate 10 to 15 cards while in college.[20] Why do the credit card companies solicit college students who have no regular job, little income, and no credit history? Because market research indicates that consumers are likely to hang onto the first credit card they obtain and use it long after graduation. Moreover, they will make 77 percent of their monthly purchases with that card.[21]

With this background, I turn now to how vast numbers of consumers are coping with

12. *Id.*

13. Bob Kerlin, *Knowing the Score on Credit,* The Washington Times, March 21, 1997, at F.

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. Chris Woodyard, *Consumers in Debt: A Sinking Feeling,* Houston Chronicle, October 14, 1996, at A NEWS.

20. *Id.*

21. Bruce Mohl, *Student Credit Cards: A visa to Big-debt Land,* San Diego Union–Tribune, October 10, 1996, at LIFESTYLE.

such easy access to credit cards. Between April 1, 1996, and March 31, 1997, 830,921 consumers [22] filed Chapter 7 bankruptcy petitions asking for the discharge of a total of $30 billion dollars in debt.[23] Of that $30 billion dollars, $6 billion represented credit card debt.[24]

The credit card issuers are lobbying Congress to tighten bankruptcy laws to deal with the massive amount of debt that is discharged each year.[25] This approach, however, will not address the underlying problem. Credit card debt represents on average about 15 percent of a debtor's debt at the time of the bankruptcy filing.[26] But this is rarely recently-acquired debt in anticipation of the filing. At least 25 percent of discharged debt is from consumers whose accounts had been current just prior to the filing.[27] Moreover, 50 percent of consumers filing bankruptcy have had an account with the same bank for more than four years.[28] Given these numbers, it is illogical for the issuer to assume it has no continuing duty to monitor accounts, update users' income, and track other debt to anticipate when an individual is no longer a good credit risk. In fact, the issuers are beginning to look at varying models, or scoring techniques, to allow them to predict more rapidly when a card holder is anticipating filing for bankruptcy.[29] It is interesting to note, however, that rarely are the issuers being advised to

actively reduce the number of cards they issue in the first place.

Indeed, at a time when consumer credit in general has not seen a significant increase in default levels, the default rates for credit card debt have continued to rise. One scholar has demonstrated that credit card operations are so much more profitable than other banking areas that lenders can relax their usual lending requirements, suffer a higher default rate, and still be money ahead.[30] Which leads to the question in this case. Can UCS sustain its burden to prove that Ms. Ellingsworth misrepresented her intent to repay its debt, and that it justifiably relied on that representation?

### C. Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code (the Code) excepts from discharge a debt for "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." [31] The Bankruptcy Act of 1898 contained language similar to section 523(a)(2)(A), and that language was interpreted by case law to except from discharge debts that arose from acts of fraudulent misrepresentation involving moral turpitude or intentional wrong.[32] That interpretation was broadened by language in the Code to include actual fraud.[33] Some Courts have discussed at length the differences, if any, between false pretenses, false representation,

**22.** Consumer Bankruptcy News, *Consumer Bankruptcies Continue to Set Record Pace,* July 3, 1997.

**23.** Faulkner & Gray, Inc., *Fending Off the Personal Bankruptcy Plague,* Bank Technology News, March 1, 1997.

**24.** *Id.*

**25.** Faulkner & Gray, Inc., *Fending Off the Personal Bankruptcy Plague,* Bank Technology News, March 1, 1997.

**26.** *Id.*

**27.** *Id.*

**28.** *Id.*

**29.** *Id.*

**30.** Lawrence M. Ausubel, *Credit Card Defaults, Credit Card Profits, and Bankruptcy,* 71 Am. Bankr.L.J. 247, 257–64 (1997).

**31.** Section 523(a)(2)(A) provides:
> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt
>
> .    .    .    .    .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

**32.** *AT&T Universal Card Serv. Corp v. Feld (In re Feld),* 203 B.R. 360, 364 (Bankr.E.D.Pa.1996).

**33.** 11 U.S.C. § 523(a)(2)(A).

and actual fraud.[34] In some instances Courts insist that there are three different torts being excepted from discharge in section 523(a)(2)(A), and the creditor is required to prove different elements for each tort.[35] Technically, some treatises instruct that false pretenses and false representation require the creditor to prove only that a debtor made a false representation, that the debtor intended to deceive with the representation, and that the creditor relied on the representation.[36] Other cases hold that the standard for nondischargeability is actual fraud. The United States Supreme Court recently held that section 523(a)(2)(A) encompasses common law misrepresentation or actual fraud.[37] This approach confirms the approach taken by the *Alvi* court, which held that the three torts are all subject to the single action test of actual fraud.[38] To prove actual or common law fraud, a creditor must prove the following:

(1) the debtor made a false representation;

(2) at the time the representation was made the debtor knew it was false;

(3) debtor subjectively intended to deceive the creditor at the time he made the representation;

(4) the creditor justifiably relied upon the representation; and

(5) creditor was damaged.[39]

While case law makes much of these five elements, most cases turn on whether debtor's use of a credit card is an actual representation that she intends to repay the money borrowed,[40] and whether the creditor justifiably relied on debtor's representation that she intended to repay.[41] It is rarely disputed that the debtor used the card, that the debt is being discharged because the debtor cannot pay the debt, and that the creditor is harmed.

■ In making its determination, the Court must, therefore, make a factual analysis of both the debtor and the creditor's conduct. In this case I will first look to Ms. Ellingsworth's conduct to discern her intent. In the past, courts have held that a debtor makes an implied representation with each use of a credit card that she has both the ability and intent to repay the debt.[42] But, fraud can be based on any type of conduct calculated to convey a misleading impression, thus, it is not relevant whether the representation is express or implied.[43] The Court in *Briese* found that "[d]ebtors do not commit fraud just by using their credit cards, even when they are heavily in debt.... To permit credit card plaintiffs to benefit from 'implications' is to engage in impermissible burden-shifting."[44]

The implied representation theory developed due to the unique nature of credit card

---

**34.** *See, e.g., AT&T Universal Card Serv. v. Alvi (In re Alvi)*, 191 B.R. 724, 729 (Bankr.N.D.Ill.1996).

**35.** *Id. See also FCC Nat'l Bank v. Etto (In re Etto)*, 210 B.R. 734, 735–36 (Bankr.N.D.Ohio April 9, 1997) (defining a false pretense as an implied misrepresentation or conduct intended to create or foster a false impression; a false representation as an express misrepresentation by a debtor; and actual fraud as a deception intentionally practiced to induce another to part with property or surrender some legal right).

**36.** *Feld*, 203 B.R. at 365.

**37.** *Id.* (citing *Field v. Mans*, ⎯ U.S. ⎯, ⎯, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995)).

**38.** *In re Alvi*, 191 B.R. at 729.

**39.** *Feld*, at 365.

**40.** *Id.* at 366; *Chevy Chase Bank v. Briese (In re Briese)*, 196 B.R. 440, 449 (Bankr.W.D.Wis. 1996).

**41.** *Field v. Mans*, ⎯ U.S. ⎯, ⎯, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995).

**42.** *Household Card Serv./Visa v. Vermillion (In re Vermillion)*, 136 B.R. 225, 227 (Bankr.W.D.Mo. 1992); *FCC Nat'l Bank v. Bartlett (In re Bartlett)*, 128 B.R. 775, 779–80 (Bankr.W.D.Mo.1991). *But see AT&T Universal Card Serv. Corp v. Nguyen (In re Nguyen)*, 208 B.R. 258, 261 (D.Mass. 1997) (stating that "an intent to deceive cannot be inferred solely from a failure to perform an implied promise, ... [and] the inability to repay a debt at the time it is incurred ... is insufficient as a rule to prove fraud").

**43.** *Feld*, 203 B.R. at 367; *AT&T Universal Card Serv. v. Alvi (In re Alvi)*, 191 B.R. 724, 732–33 (Bankr.N.D.Ill.1996).

**44.** 196 B.R. at 449.

transactions.[45] Since a debtor presents a credit card to a third party merchant when making a purchase, not the issuer, Courts held that there could be no direct representation or contemporaneous reliance with each use of the card.[46] Courts, therefore, held that with each use of the card, a debtor made an implied representation that she had the ability and intent to repay the debt.[47] With the advent of electronic transmission of credit card transactions, creditors are now instantly aware when a debtor uses its card. Therefore, debtors make an express representation to the issuer each time they use the card that they intend to repay the debt.[48] It is not clear if debtors ever made a representation of an ability to repay.[49] However, as was recently pointed out by the Honorable Leif M. Clark, in the real world very few people who use credit cards represent a present ability to pay.[50] They are using a credit card instead of cash precisely because they do not have the present ability to pay.[51] It is this condition that allows card issuers to charge the interest and finance charges that make the credit card business so profitable. Judge Clark noted, ironically, that "an ability to repay is inferred to protect an industry that purposefully solicits customers who generally lack such ability."[52]

A minority of Courts hold that the credit card company assumes the risk of nonpayment with the use of the card, unless the issuer told the debtor to stop using its card.[53]

Both the assumption of the risk theory and the implied representation theory were developed at a time when there was a significant lag between the time the card was used and the transaction was actually recorded with the issuer. Neither theory is as relevant today when most credit transactions are automatically recorded electronically at the instant the card is used. The issuer has the technology to refuse to accept the transaction before the merchant completes the sale. In fact, most merchants today will not complete the sale until they receive a code accepting the card. Likewise, if an issuer wishes to terminate the use of a card it can do so automatically. It does not have to inform the debtor to stop using the card, and then wait for it to be mailed back. I, therefore, find that debtors make express representation that they intend to repay the obligation each time they use a credit card.

With these fictional theories removed from the analysis,[54] I must decide two things. Did Ms. Ellingsworth falsely represent to UCS that she intended to repay her obligation to UCS at the time she used the credit card, and did UCS justifiably rely on that representation.

Direct proof of an individual's actual intention and purpose is nearly impossible to find. Therefore, case law has developed a list of circumstantial factors which a creditor might use to infer intent.[55] These objective or cir-

45. *Feld*, at 365.

46. *Id.*

47. *Id.*

48. *GM Card v. Cox (In re Cox)*, 182 B.R. 626, 628 (Bankr.D.Mass.1995).

49. See, e.g., *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285–86 (9th Cir.1996); *Feld*, 203 B.R. at 367; See also *American Express Travel Related Serv. Co, v. Christensen (In re Christensen)*, 193 B.R. 863, 866 (N.D.Ill.1996); *Chevy Chase Bank, FSB (In re Briese)*, 196 B.R. 440, 448 (Bankr.W.D.Wis.1996). *Contra Feld*, at 367 n. 10 (citing *Mercantile Bank v. Hoyle (In re Hoyle)*, 183 B.R. 635, 638 (Bankr.D.Kan.1995); *Bank One Columbus, N.A. v. McDonald (In re McDonald)*, 177 B.R. 212, 216–17 (Bankr. E.D.Pa.1994); *Chase Manhattan Bank v. Weiss (In re Weiss)*, 139 B.R. 928 (Bankr.D.S.D.1992); *Household Card Serv./Visa v. Vermillion (In re Vermillion)*, 136 B.R. 225, 226–27 (Bankr. W.D.Mo.1992)).

50. *Sears, Roebuck and Co. v. Hernandez (In re Hernandez)*, 208 B.R. 872, 880 (Bankr.W.D.Tex. 1997).

51. *Id.*

52. *Id.* See also *Chase Manhattan Bank. N.A. v. Ford (In re Ford)*, 186 B.R. 312, 317 n. 6 (Bankr. N.D.Ga.1995).

53. See, e.g., *First Nat'l Bank of Mobile v. Roddenberry (In re Roddenberry)*, 701 F.2d 927, 932–33 (11th Cir.1983).

54. *Chevy Chase Bank, FSB (In re Briese)*, 196 B.R. 440, 450 (Bankr.W.D.Wis.1996)

55. *Citibank South Dakota N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP

cumstantial factors, much like the "badges of fraud," are:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. The debtor's financial sophistication;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.[56]

The goal in applying these factors is not to determine whether a reasonable debtor should have known that she was in over her head, and would not be able to pay her obligations. Instead, these factors are an aid in determining whether this debtor knew she would actually be unable to repay this debt.[57] If so, the debtor incurred the debt with the intent not to repay it.

■ Here, the Ellingsworths filed their Chapter 7 petition within 75 days of using the credit card for the first time. The majority of the cash advances were taken within 60 days of the filing. Between September 11, 1996, and October 15, 1996, Ms. Ellingsworth made 16 cash advances and 8 purchases totaling approximately $4000. According to the bankruptcy schedules, the debtors had over $70,000 in unsecured debt at the time of filing. Ms. Ellingsworth testified that all of the other credit cards were "maxed out" when she began to use the UCS card, therefore, she and her husband had at least $65,000 in debt when the charges were made. Ms. Ellingsworth testified that she did not contact an attorney until she stopped using the UCS card. She did, however, state that she realized on October 15, 1996, that they could not go on using credit cards to meet their expenses, and that they needed credit counseling. She stated she and Mr. Ellingsworth made an appointment with Consumer Credit Counseling on October 18, 1996.[58] The counselor at Consumer Credit Counseling told the debtors that they could not cut their expenses enough to service their debt, and that they should consider filing bankruptcy. According to the worksheet prepared by debtors and the counselor, debtors had net income of $4180 and minimum living expenses of $3383 leaving disposable income of $797.[59] They needed $1465 a month to pay the minimum on their credit cards.[60] Ms. Ellingsworth testified that she voluntarily ceased using the UCS card before she went to credit counseling. I note, however, that she stopped using the card when she reached the credit limit. I also note that Mr. Ellingsworth testified that he contacted Consumer Credit Counseling long enough before their appointment to allow debtors to fill out all the financial information and return it to the counselor five days before their appointment. It appears, therefore, that debtors had determined they at least needed professional advice before they ceased using the UCS card.

Debtor's employment is not at issue here, as she has been employed as a school teacher for 18 years. Though both Mr. and Mrs.

1988). *See also In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987).

**56.** *Dougherty*, at 657; *Sears, Roebuck, and Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 757 (Bankr. N.D.Ind.1986); *Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724, 730 (Bankr. N.D.Ga.1985).

**57.** *Field v. Mans*, —— U.S. ——, ——, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995) (holding that the creditor must prove the elements of actual fraud).

**58.** Deb. Ex. I.

**59.** *Id.*

**60.** *Id.*

Ellingsworth claim that Mr. Ellingsworth's job change was the straw that broke their financial backs, they did not well substantiate that claim. Mr. Ellingsworth claimed he took a decrease in salary, but the decrease seems to be related to the loss of a potential bonus he may have received as a buyer. He also made up for some of the decrease in pay by eliminating a voluntary contribution he was making to a 401(k) plan in the amount of $175.50 a month. Mr. Ellingsworth stated his employer had provided him with a car when he was a buyer, and now he had to provide his own transportation. The car expense represented the largest increased expense after this job change. Ms. Ellingsworth testified that they pay $187 a month for the car plus car insurance and gasoline. His job change was effective in August of 1997. They both insisted at trial that all of the charges were made for necessities. But, Ms. Ellingsworth could not explain a charge in the amount of $63.46 at Dave's Guns in Pataskala, Ohio, nor could she explain a charge in the amount of $217.23 at Golf Discount Campbell in Springfield, Missouri.[61] Ms. Ellingsworth attempted to explain the medical expenses she encounters with three children, but she again failed to document these expenses. She admitted that they have health insurance that pays 80 percent of their health costs, and she did not refer to any specific illness that accounted for some of the funds she obtained with the UCS card.

Finally, I note that the debtors are intelligent and articulate people. They were not convincing when they said that, even though they had over $70,000 in unsecured debt, a second mortgage on their home, and had been using credit cards for six years to make ends meet, they didn't realize the extent of their financial difficulty until they went to client counseling. I especially note that the charges on the UCS card were made over a very short period of time and debtors stopped using the card as soon as the limit was reached. I, therefore, find that when Ms. Ellingsworth used the UCS card she knew that she would be unable to ever repay the debt, and she, therefore, did not intend to repay the debt.

A determination of intent, however, deals only with the debtor's conduct. I turn next to whether UCS proved that it justifiably relied upon Ms. Ellingsworth's representation of her intent to repay.[62] The Supreme Court attempted to distinguish reasonable and justifiable reliance in *Field v. Mans* as follows. Reliance may be justifiable even if it does not conform to the standard of a reasonable man. For example, a creditor may justifiably rely on a debtor's statement that his house is free and clear of liens, without going to the recorder of deeds office to check for itself.[63] On the other hand, a creditor is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." [64] For example, the Supreme Court stated, if a seller represents that a horse is sound when it is apparent that it has one eye, the buyer cannot be said to have justifiably relied upon the representation.[65] This clarification is not always apparent in the credit card context. The **Restatement (Second) of Torts** does instruct, however, that "justification is a matter of the qualities and characteristics of a particular plaintiff, and the circumstances of a particular case, rather than of the application of a community standard of conduct in all cases." [66] In *Citibank South Dakota v. Dougherty (In re Dougherty)*,[67] the Court found that credit card abuse is actual fraud. In other words, the debtor intentionally hid information from the creditor that the creditor could not otherwise obtain, thus, the misrepresentation is

**61.** P1. Ex. A.

**62.** *Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). *See also Household Credit Serv., Inc. v. Walters (In re Walters)*, 208 B.R. 651, 653 (W.D.La.1997).

**63.** *Id.*

**64.** *Id.* (*quoting,* Restatement (Second) of Torts, § 541, Comment a (1976)).

**65.** *Id.*

**66.** *Id.* (*quoting,* Restatement (Second) of Torts, § 541, Comment a (1976)).

**67.** 84 B.R. 653, 657 (9th Cir. BAP 1988).

not readily apparent. To that end the Court examined debtor's prepetition conduct to look for evidence of behavior which indicated an intention to conceal.[68] When considered in this light, it becomes clear that UCS had access to much of the same information emphasized in the *Dougherty* factors that is now available to this Court. Credit card issuers have come to rely on these factors when determining whether to object to the discharge of their debt after someone files for bankruptcy relief. Interestingly, rarely do creditors consider these factors prior issuing a card. Mr. Carter testified that UCS relied solely on these factors in determining whether to object to the discharge of Ms. Ellingsworth's debt. UCS, therefore, did not attend the section 341 meeting and it did not conduct a 2004 examination prior to filing the adversary proceeding.

Credit card issuers are very sophisticated creditors. They have instant electronic access each time a credit card is used now. They know the number of charges made in a given day, they know the amount of those charges, and they know when a customer exceeds his credit limit. While they do not know with each use whether a debtor is employed, the issuers could, and often choose not to, obtain updated information about debtor's employment status. Moreover, the issuers elect not to obtain any other financial information, including assets and liabilities, about potential customers at the time a pre-approved card is issued. Often the reaction of a creditor at the time a user exceeds the credit limit on his account is to increase the limit.[69] Mr. Carter testified that on many accounts, UCS grants a gap over the limit, ostensibly to prevent embarrassing a customer by refusing to accept a charge if the limit

has been exceeded.[70] In *First USA Bank v. Hunter (In re Hunter)*, the Court noted that First USA extended an invitation to Mr. Hunter to accept its Platinum Card one week before the trial was to begin on its Complaint objecting to the discharge of its debt in Mr. Hunter's bankruptcy case.[71] I also note that, while UCS has not offered Ms. Ellingsworth another pre-approved card, according to the Credit Bureau Report, she has obtained four new credit cards since the bankruptcy filing.[72]

Thus, in order to determine if UCS justifiably relied on any representation of intent to repay Ms. Ellingsworth made before UCS extended her credit, I must first focus on the common sense actions of UCS while considering the qualities and characteristics of this creditor.

■ Ms. Ellingsworth did not request UCS's credit card. UCS, with all of the sophisticated tools of the credit scoring industry at its disposal, made a calculated decision to offer Ms. Ellingsworth its credit card with a $4000 limit. Mr. Carter testified that UCS does not pull a credit bureau report on potential customers, because that would be too time consuming and costly. The Agreement states that "[t]his agreement will be effective when you or an authorized User uses the Card or the Account, or if you fail to cut your Card in half and return it to us within 30 days after it is issued to you."[73] In other words, UCS never required so much as a signature from Ms. Ellingsworth acknowledging that she accepted all of the terms contained in the Agreement. Moreover, the Agreement authorizes UCS or its subsidiaries and affiliates "to make or have made any credit, employment, and investigative inquiries we deem appropriate related to

68. *Id.*

69. *See e.g. AT&T Universal Card Serv. v. Burdge (In re Burdge)*, 198 B.R. 773, 775 (9th Cir. BAP 1996); *AT&T Universal Card Serv. v. Reneer (In re Reneer)*, 208 B.R. 731, 733 (Bankr.M.D.Fla. 1997); *AT&T Universal Card Serv. Corp. v. Sziel (In re Sziel)*, 206 B.R. 490, 493–94 (Bankr. N.D.Ill.1997); *Bank One Columbus, N.A. v. McDaniel (In re McDaniel)*, 202 B.R. 74, 76 (Bankr.N.D.Tex.1996); *AT&T Universal Card Serv. Corp. v. Chinchilla (In re Chinchilla)*, 202 B.R. 1010, 1015 (Bankr.S.D.Fla.1996); *AT&T*

*Universal Card Serv. Corp v. Totina (In re Totina)*, 198 B.R. 673, 675 (Bankr.E.D.La.1996).

70. *See e.g. AT&T Universal Card Serv. Corp v. Wong (In re Wong)*, 207 B.R. 822, 830 (Bankr. E.D.Pa.1997) (where UCS allowed a debtor to exceed his $10,500 credit limit by $2,743).

71. 210 B.R. 212, 213 (Bankr.M.D.Fla.1997).

72. Pl.Ex. D.

73. Pl.Ex. B., at ¶ 2.

**338**

this extension of credit, or the collection of amounts owed on your account." [74] And, in preparation for this dischargeability proceeding, UCS did authorize a full Credit Bureau report.[75] Credit card issuers are sophisticated lenders. They make their decisions to offer customers credit cards not out of some altruistic notion of helping society, but because credit cards are very profitable. They carefully solicit customers who are most likely to use their services in a manner that increases those profits. They don't seek out or want customers who demonstrate an ability to pay by paying their other accounts in full each month. Judge Clark noted in *In re Hernandez* that one large credit card company (not UCS) makes $318 a year on the typical customer who carries a balance, while it loses $30 a year on customers who pay their monthly balance each month.[76] A credit score demonstrates a likelihood a debtor will not default. It is not based upon an analysis of one's assets, secured liabilities, and living expenses. Mr. Carter admitted that credit scoring will not eliminate potential customers who are insolvent. In fact, Ms. Ellingsworth received a credit score, which was acceptable to UCS, at a time when, according to her bankruptcy schedules, the credit bureau report, and the information sheet from Consumer Client Counseling, her expenses exceeded her income by at least $500.00 a month.[77]

■ Credit scoring reflects the practice of targeting individuals who use many credit cards and pay the minimum amount each month, rather than paying off their balance. Mr. Carter testified that a minimum payment on UCS's card is 2.1 percent of the outstanding balance each month. Surely UCS understands that customers with excess disposable income would not choose to make minimum payments leaving balances that incur interest in excess of 15 percent per annum.[78] Offering this customer a pre-approved card, without making any individual inquiry into her financial status, is the equivalent of buying a horse with one eye. If the credit card issuers choose to continue this profitable technique to increase their customer base, they cannot claim that they justifiably relied upon any representation the customer made at the time the card was issued.[79] In other words, a creditor cannot justifiably rely on any representation, or the absence thereof, made by a card holder if the card was pre-approved, and no direct financial information was obtained by the issuer.[80] Moreover, if UCS did

74. Pl.Ex. B, at ¶ 16.

75. Pl.Ex. D.

76. 208 B.R. 872, 879 (Bankr.W.D.Tex.1997).

77. Pl.Ex. D; Deb. Ex. I; Doc. # 1, Case NO. 96–61676. *See AT&T Universal Card Serv. Corp. v. Berry (In re Berry)*, 197 B.R. 382, 383 (Bankr. M.D.Fla.1996) (holding that ["o]ne who lacks concern for its borrower's insolvency when enabling the borrowing cannot prove it was defrauded merely by proving the borrower was insolvent and knew it").

78. Pl.Ex. A; Pl.Ex. B, ¶ 11. I note that the Agreement established an annual percentage rate of 16.4 percent, however, the two statements received by Ms. Ellingsworth also disclose the effective annual percentage rate when the cash advance fees are included. On the first statement the effective annual percentage rate was 29.54 percent. Pl.Ex. A.

79. *See American Express Travel Related Serv. Co. v. Christensen (In re Christensen)*, 193 B.R. 863, 867 (N.D.Ill.1996) (holding that "the mere passive extension of credit does not constitute any form of reliance").

80. *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1085 (6th Cir.1988) (holding that at a minimum a credit check must be preformed before a credit card is issued in order to have any resulting debt declared nondischargeable); *Household Credit Serv., Inc. v. Walters (In re Walters)*, 208 B.R. 651, 654–55 (W.D.La.1997); *FCC Nat'l Bank v. Etto (In re Etto)*, 210 B.R. 734, 739–40 (Bankr.N.D.Ohio 1997); *AT&T Universal Card Serv. Corp. v. Akdogan (In re Akdogan)*, 204 B.R. 90, 97 (Bankr. E.D.N.Y.1997) (stating that a creditor must do a credit check or some other circumstances must exist to prove it did not extend credit blindly); *Bank One Columbus, N.A. v. McDaniel (In re McDaniel)*, 202 B.R. 74, 78 (Bankr.N.D.Tex. 1996) (holding that "a creditor cannot sit back and do nothing and still meet the standard for justifiable reliance when it had an opportunity to make an adequate examination and investigation"); *AT&T Universal Card Serv. v. Richards (In re Richards)*, 196 B.R. 481, 482 (Bankr.E.D.Ark. 1996) (holding that reliance must be proven by some evidence). *But see AT&T Universal Card Serv. v. Burdge (In re Burdge)*, 198 B.R. 773, 778 (9th Cir. BAP 1996) (holding there is no ongoing duty to investigate before raising the credit limit if the debtor has a good payment history); *AT&T Universal Card Serv. Corp v. Burns (In re Burns)*,

not justifiably rely upon Ms. Ellingsworth's representations at the time the card was issued, reliance cannot then attach when the card is used. I find, therefore, that the credit in this case was extended to Ms. Ellingsworth without justifiable consideration of her ability to repay. If UCS did not consider her ability to repay, it certainly cannot now claim that it relied on her intent. Indeed, to hold otherwise only encourages creditors to continue to act irresponsibly. At the time debtor used the card, the only information UCS had obtained was debtor's credit score as of a year before, her income, and her employment. Thus, UCS made the loan to debtor without consideration of her assets, her secured debt, or her other living expenses. Surely a bank that made an unsecured loan to a customer without obtaining such basic information could not be said to have justifiably relied on the debtor's representation that she intended to repay the debt. The issue, then, is whether a credit card company is entitled to more favorable treatment than a lender in a face to face transaction with a debtor. Which brings me to the presumption of nondischargeability in section 523(a)(2)(C).

### D. Section 523(a)(2)(C)

Section 523(a)(2)(C) presumes the nondischargeability of cash advances exceeding a total of $1000 taken within 60 days of filing:

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods and services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor.[81]

The presumption is rebuttable.[82] Congress adopted this provision to address what it considered an especially egregious form of behavior referred to as "loading up."[83] Loading up is defined as "going on a buying spree in contemplation of bankruptcy."[84] The Court in *In re Cox* found that the presumption in section 523(a)(2)(C) is the exclusive remedy against loading up.[85] Only debt incurred within the 60 day period is subject to the presumption, but it can be rebutted if the debtor can demonstrate that the debt was not incurred in anticipation of a bankruptcy discharge.[86] Furthermore, "debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents" are not covered by the presumption.[87] Before discussing the issue of whether Ms. Ellingsworth and her husband successfully rebutted the presumption, I will discuss the effect of the presumption. The legislative history indicates that the presumption shifts the burden to the debtor to prove the dischargeability of a debt, as opposed to the burden resting squarely on the

196 B.R. 11, 14 (Bankr.W.D.N.Y.1996) (holding creditor does not have to prove it investigated debtor's creditworthiness if debtor does not claim the card was preapproved and debtor was insolvent at the time).

**81.** 11 U.S.C. § 523(a)(2)(C).

**82.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985); *Citibank South Dakota, N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1092 (9th Cir.1996); *Aetna Finance Co. v. Neal (In re Neal),* 113 B.R. 607, 608 (9th Cir. BAP 1990); *Sears Roebuck and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872, 880 (Bankr.W.D.Tex.1997).

**83.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985).

**84.** *Id.*

**85.** *GM Card v. Cox (In re Cox),* 182 B.R. 626, 635 (Bankr.D.Mass.1995). *See also AT&T Universal Bank v. Hensley (In re Hensley),* 201 B.R. 494, 498 (Bankr.S.D.Ohio 1996). *But see AT&T Universal Card Serv. Corp. v. Pakdaman (In re Pakdaman),* 210 B.R. 886, 886–87 (D.Mass. 1997) (holding that the *Cox* bankruptcy court struck a balance too harshly against a creditor when it found that credit card debt could not be found nondischargeable under section 523(a)(2)(A)).

**86.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985).

**87.** 11 U.S.C. § 523(a)(2)(C).

creditor to prove the nondischageability of a debt incurred outside the presumption period.[88] This shift of the burden means "the reliance element inherent in section 523(a)(2)(A) is not relevant in the context of subsection 523(a)(2)(C)."[89] Thus, if the debt is subject to the presumption, Congress has determined that it is the debtor's intent alone, and not the creditor's conduct, which determines dischargeability.

I note that Ms. Ellingsworth used her UCS card to make two purchases within 60 days of the filing, but the aggregate sum of those purchases was $61.94.[90] Further, UCS did not claim the purchases were for luxury items. I, therefore, find the purchases do not fall within the ambit of section 523(a)(2)(C). The cash advances, on the other hand, taken after September 25, 1996, total $2058 (not including finance charges of $74.76),[91] and they, therefore, do represent debt that is presumed nondischargeable.

In attempting to rebut this presumption, Mr. and Mrs. Ellingsworth both testified that the cash advances were taken to pay reasonably necessary living and medical expenses for themselves and their three children. As discussed above, I have already found that Ms. Ellingsworth used her UCS card at a time when she could not have intended to repay the obligation. That finding will not change under a section 523(a)(2)(C) analysis. I note, however, that some recent cases have found cause to accept unsupported testimony of debtors that they incurred debt within the presumptive period to pay reasonable living expenses and not in contemplation of bankruptcy.[92] Or alternatively, courts have analyzed the items purchased with a credit card to determined if they are luxury goods.[93] I find neither approach addresses the concerns of Congress when it adopted section 523(a)(2)(C) in 1984 and amended it in 1994.[94] Rule 301 of the Federal Rules of Evidence "imposes upon the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption but does not shift to such party the burden of proof."[95] This evidentiary presumption is known as the "bursting bubble theory."[96] In order to rebut this presumption the opponent "need only introduce evidence sufficient to support a finding contrary to the presumed fact and the presumption disappears."[97] The legislative history of section 523(a)(2)(C), however, indicates that Congress intended for a debtor to do more than simply present evidence that

**88.** *Id. See also Citibank South Dakota, N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1092 (9th Cir.1996).

**89.** *Sears Roebuck and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872, 881 n. 17 (Bankr. W.D.Tex.1997). *See also AT&T Universal Card Serv. v. Acker (In re Acker),* 207 B.R. 12, 16 (Bankr.M.D.Fla.1997) (holding that a presumption of fraud eliminates the need to prove reliance); *First Card Serv., Inc. v. Kitzmiller (In re Kitzmiller),* 206 B.R. 424, 428 (Bankr.N.D.W.Va. 1997) (stating that the presumption of nondischargeability satisfies the 5 elements of fraud the creditor must prove). *But see MBNA America v. Simos (In re Simos),* 209 B.R. 188, 195 (Bankr. M.D.N.C.1997) (holding that section 523(a)(2)(C) shifts the initial burden of going forward); *Bank One Columbus, N.A. v. Fulginiti (In re Fulginiti),* 201 B.R. 730, 734 (Bankr.E.D.Pa.1996) (holding that section 523(a)(2)(C) shifts the burden of production, and not the burden of proof, on the issue of intent only).

**90.** Pl.Ex. A.

**91.** *Id.*

**92.** *See e.g. MBNA America v. Simos (In re Simos),* 209 B.R. 188, 195 (Bankr.M.D.N.C.1997); *AT&T Universal Card Serv. v. Acker (In re Acker),* 207 B.R. 12, 17 (Bankr.M.D.Fla.1997); *First Card Serv., Inc. v. Kitzmiller (In re Kitzmiller),* 206 B.R. 424, 428 (Bankr.N.D.W.Va.1997); *Bank One Columbus, N.A. v. Fulginiti (In re Fulginiti),* 201 B.R. 730, 734 (Bankr.E.D.Pa.1996); *MBNA America v. Chrusz (In re Chrusz),* 196 B.R. 221, 223–24 (Bankr.D.N.H.1996); *J.C. Penney Co. v. Leaird (In re Leaird),* 106 B.R. 177, 180 (Bankr. W.D.Wis.1989).

**93.** *In re Hernandez,* 208 B.R. at 881–82.

**94.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985); HR Rep. 103–834, 103rd Cong., 2nd Sess. 40 (Oct. 4, 1994); 140 Cong. Rec. H10770.

**95.** Fed.R.Evid. 301.

**96.** *FCC Nat'l Bank v. Orecchio (In re Orecchio)* 109 B.R. 285, 289 (Bankr.S.D.Ohio 1989).

**97.** *Id.*

could support a contrary result.[98] Congress was concerned with what it considered egregious conduct on the part of debtors who incurred debt at a point when their insolvency should have been obvious.[99] In *Orecchio* the Court, therefore, held that a debtor must offer substantial and believable evidence contrary to the presumed intent in order to demonstrate non-fraudulent intent.[100] Otherwise, the usefullness of the presumption in section 523(a)(2)(C) is destroyed. A mere profession of intent to repay will not suffice if the debtor is not credible as to her intent.[101]

The fact that the debt in this case resulted from cash advances also increases the sufficiency of the evidence necessary to rebut the presumption. Luxury goods are defined in the negative as goods not reasonably necessary for a debtor's support,[102] however, it is possible for a court to determine from the billing statement and the nature of the items purchased whether goods represent expenditures for basic living expenses. On the other hand, it is more difficult for the Court to discern how cash is spent once a cash advance is taken. In fact, from the language of section 523(a)(2)(C), it is not clear that the presumption is rebuttable as to cash advances. The section states that " 'luxury goods or services' do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." [103] There is no mention of cash advances in the legislative history. But, given Congress' obvious abhorrence of "loading up," and the difficulty of proving what cash was used for, Congress may have intended cash advances to be nondischargeable if taken within the presumption period, regardless of how the money was used. I need not decide here whether the cash advance presumption can ever be rebutted, since Ms. Ellingsworth did not offer sufficient evidence tracing the funds acquired by cash advance to reasonable living expenses. And, even if

she had, I have found that she incurred the debt to UCS with the knowledge that she would not be able to repay it at some future time, and, therefore, with the intent not to repay.

### E. Attorney's Fees

Mr. Carter testified that the cost to UCS of collecting this debt to date is $1,937.50. There was no objection to this testimony. UCS claims the Agreement authorizes this Court to award it all of its costs of collection and its costs to defend any legal action.[104] The Agreement states that a debtor is in default if she is insolvent or if she fails to meet her obligations under the agreement.[105] It also states that:

> If you are in default and fail to pay any amounts you owe on your account, you will be liable for our costs of collection and, if we refer this claim to an attorney for collection, you will be liable for any reasonable attorney's fees we incur, plus the costs and expenses of any legal action.[106]

It is not disputed that Ms. Ellingsworth defaulted under the terms of the Agreement, and that the Agreement provides for recovery of fees for any legal action. Therefore, any reasonable fees incurred in pursuing this adversary proceeding will be allowed. Ms. Ellingsworth did not object to the reasonableness of UCS's fees, therefore, UCS is allowed its attorney's fees in the amount of $1,937.50.

In sum, I find that the debt incurred for cash advances during the presumption period, in the amount of $2058 is nondischargeable. The remainder is dischargeable. I further find that UCS is entitled to its attorney's fees and costs of collection in the amount of $1,937.50.

**98.** *Id.*

**99.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985); HR Rep. 103–834, 103rd Cong., 2nd Sess. 40 (Oct. 4, 1994); 140 Cong. Rec. H10770.

**100.** 109 B.R. at 289.

**101.** *Id.*

**102.** *In re Hernandez,* 208 B.R. at 880.

**103.** 11 U.S.C. § 523(a)(2)(C).

**104.** Pl.Ex. B, ¶ 14.

**105.** *Id.*

**106.** *Id.*