In re Patricia J. BIXEL, Debtor.

PROVIDIAN BANCORP, Plaintiff,

v.

Patricia J. BIXEL, Defendant.

Bankruptcy No. 97–01798–H7.
Adversary No. 97–90357–H7.

United States Bankruptcy Court,
S.D. California,
San Diego Division.

Dec. 12, 1997.

Thomas J. Stolp, Law Offices of Steven J. Melmet, Santa Ana, CA, for Plaintiff.

William J. Howell, Attorney at Law, San Diego, CA, for Defendant.

Gerald Davis, Coronado, CA, Trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

JOHN L. PETERSON, Bankruptcy Judge.

Debtor/Defendant Patricia J. Bixel ("Bixel") filed a voluntary Chapter 7 bankruptcy petition on February 6, 1997. On May 15, 1997, Plaintiff Providian Bancorp ("Providian") filed an adversary complaint alleging the fraudulent use of its credit card and seeking to except from discharge, pursuant to 11 U.S.C. § 523(a)(2)(A), the sum of $8,958.31. Bixel filed a timely answer to Providian's complaint on May 28, 1997, deny-

ing several of Providian's allegations and requesting an award of attorney's fees pursuant to 11 U.S.C. § 523(d).[1]

Subsequently, after due notice, trial was held October 20, 1997, at San Diego. Thomas J. Stolp, counsel for Providian, appeared at the trial as did William J. Howell, counsel for Bixel. In addition, Bixel testified as did Alice Quinton, bankruptcy manager at Providian, and Providian introduced Exhibits 1, 2 and 3 without objection. Both parties filed trial briefs, thus, at the close of trial, the Court deemed the record closed and took the matter under submission. After considering the testimony presented at trial, and after reviewing the record and applicable law, the Court finds for Bixel.

## I. BACKGROUND

In the fall of 1994, Bixel received by mail, an invitation from Providian to accept a VISA Gold Card (Exhibit 1—"30–Second Response Certificate"). Bixel accepted the invitation by signing her name to the invitation and providing her social security number, home telephone number and work telephone number. Upon receipt of the signed invitation from Bixel, Providian performed an underwriting evaluation to determine whether Bixel was "credit-worthy." Providian also contacted Bixel by telephone to verify her income. However, Providian did not request a financial statement or any other type of documentation regarding Bixel's financial position.

Shortly thereafter, Bixel obtained a VISA Gold Card from Providian ("Providian card") that had a credit line of $11,600.00. Bixel immediately began using the card and used the card on a regular basis for the next two years. During this two year period, Bixel used the Providian card to obtain several cash advances and to make numerous purchases. Bixel also made numerous payments on her account. For instance, the first month that Bixel had the card, Bixel made two purchases totaling $310.45 and obtained a cash advance of $301.00. (Exhibit 2—a collection of Bixel's credit card statements

ranging from November 7, 1994, to February 6, 1997). In May of 1995, Debtor made numerous purchases, and during a two week period, obtained cash advances on her Providian card of $2,242.02. At the time of Bixel's June 6, 1995, statement, she had an account balance of $7,170.80. However, Bixel was only making minimum payments on her account, thus, by September of 1995, Bixel's account had increased to $8,778.68. Then, on September 7, 1995, Bixel made a payment of $6,700.00 on her account, reducing the outstanding balance to $2,116.42.

Bixel's outstanding balance remained under $3,000.00 for the next several months and Providian does not challenge the charges or cash advances made by Bixel before July 11, 1996. Providian does, however, take exception to the charges and cash advances made by Bixel from July 11, 1996, through September 24, 1996. Bixel did not use her Providian card after September 24, however, she made a final payment on October 4, 1996.

The following is a summary of Bixel's account activity from July 11, 1996, through October 4, 1996. From July 11 through August 3, Bixel made thirteen purchases totaling $1,542.59, made a minimum monthly payment of $56.00 and returned merchandise on three occasions for credit adjustments totaling $227.63. From August 4 through September 3, Bixel made five purchases totaling $413.35, took four cash advances totaling $6,644.81, made a payment of $100.00, which exceed the minimum monthly payment due of $82.00, and returned merchandise for a credit of $42.56. Finally, from September 4 through October 4, Bixel made five purchases totaling $357.56 and made a payment of $225.00, which exceeded the minimum monthly payment due of $223.00.

Based on the foregoing, Bixel's statement of October 7, 1996, showed an account balance of $11,502.23. In November of 1996, Bixel incurred a late charge and a finance charge totaling $208.21, which charges pushed her account balance over the credit limit of $11,600.00. In addition, Bixel did not make any payments on her account after

---

**1.** Bixel, in her answer, included a request for reimbursement of fees pursuant to 11 U.S.C. § 523(d). However, Bixel did not address the issue in her Pre–Trial Order or her Trial Brief. In addition, neither party raised the issue at trial. Thus, the Court deems the matter waived.

October 4, 1996. Thus, Bixel's account balance continued to increase, but only as a result of late fees, finance fees and over-limit fees. On February 6, 1997, Bixel's balance on her Providian card was $12,465.50.

## II. STANDARD OF REVIEW

■ This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This is a core proceeding for purposes of § 157(b)(2)(I). On the issue of the determination of non-dischargeability of debts, the Ninth Circuit Court of Appeals imposes a "weighty burden" on creditors, strictly construing exceptions to discharge in favor of debtors in order "to effectuate the Congressional policy" of affording debtors a "fresh start". *Gregg v. Rahm (In re Rahm)*, 641 F.2d 755, 756–57 (9th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); *McCrary v. Barrack (In re Barrack)*, 201 B.R. 985, 989 (Bankr. S.D.Cal.1996). Notwithstanding the weighty burden, a creditor, in order to prevail, need only establish the elements of fraud under 11 U.S.C. § 523, by a preponderance of the evidence. *American Express Travel Related Services Co., Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125; *see Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

## III. ANALYSIS OF SECTION 523(a)(2)(A)

To establish non-dischargeability as a result of fraud under § 523(a)(2)(A) [2], courts in the Ninth Circuit have employed the following five-part test:

(1) that the debtor made . . . representations;

(2) that the debtor knew were false when made;

(3) that the debtor made the representations with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*In re Hashemi*, 104 F.3d at 1125; *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir.1996). The elements of this test mirror the common law elements of fraud as set forth in the Restatement (Second) of Torts (1976) §§ 525–557A. *Field v. Mans*, 516 U.S. 59, 68–73, 116 S.Ct. 437, 443–44, 133 L.Ed.2d 351 (1995).

■ Each time a "card holder uses his credit card, he makes a representation [to the credit card company] that he intends to repay the debt." *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996). Thus, to prove the first element of fraud—that a debtor made a representation— credit card company need only establish that the debtor used the credit card. As to the remaining elements, a credit card company sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of each case, answers the following three inquiries in the affirmative: 1) did the debtor fraudulently fail to disclose his or her intent not to repay the credit card debt—intent to deceive; 2) did the credit card company justifiably rely on the debtor's representation—reliance; and 3) was the debt sought to be discharged proximately caused by the first two elements—causation. *Anastas*, 94 F.3d at 1284 (referring to *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996)).

---

**2.** 11 U.S.C. § 523(a)(2)(A) reads:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

### A. Whether the debtor fraudulently failed to disclose the intent not to repay a credit card debt.

■ Establishing the intent of a debtor, in the context of a credit card transaction, is often an onerous task since the debtor and the credit card issuer generally never have any face-to-face contact. *Eashai*, 87 F.3d at 1087. However, in the Ninth Circuit, the Court of Appeals applies the "totality of the circumstances" approach, which allows courts to "infer the existence of the debtor's intent not to pay if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor ." *Eashai*, at 1087 (rejecting the "implied representation" theory and the "assumption of the risk" theory). To facilitate courts in their application of the "totality of the circumstances" theory, the Ninth Circuit Court of Appeals has adopted twelve non-exclusive factors to consider when determining whether a debtor had the requisite intent to deceive:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*Eashai*, 87 F.3d at 1087–88 (adopting the twelve factors set forth in *Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657, (9th Cir. BAP 1988) "to establish the element of intent to deceive").

■ The *Dougherty* factors focus a court's inquiry on a debtor's intent to repay rather than on a debtor's ability to repay. As emphasized by the Ninth Circuit Court of Appeals: "[T]he representation made by the card holder in a credit card transaction is not that he has an ability to repay the debt; it is that he has an intention to repay." *Anastas*, 94 F.3d at 1285. Indeed:

[T]he focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt. Rather, the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. A finding that a debt is non-dischargeable under § 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law.

. . .

...the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith.

*Anastas*, 94 F.3d at 1285–86. *See also, Eashai*, 87 F.3d at 1090 ("A substantial number of bankruptcy debtors incur debts with the hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting nondischarge.") (quoting *Karelin v. Bank of American Nat'l Trust & Savs. Ass'n (In re Karelin)*, 109 B.R. 943, 948 (9th Cir. BAP 1990)).

### B. Whether the credit card company justifiably relied on the debtor's false representation.

■ In addition to proving that a debtor had the intent to deceive, a credit card company must also establish that it relied on the false representations made by the debtor. *Field*, 516 U.S. at 59–60, 116 S.Ct at 438, 133

L.Ed.2d 351 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id.* As the Supreme Court held in *Field v. Mans,* "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at 70, 116 S.Ct. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had not experiences with horses."

*Id.* (quoting § 541, Comment a., Restatement (Second) of Torts (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte,* 96 F.3d at 1322. In the context of credit card debt, " the credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable." *Anastas,* at 1286.

**C. Whether the debt sought to be discharged was proximately caused by inquiries A and B as set forth above.**

■ Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a credit card company must establish that a claim sought to be discharged arose from an injury proximately resulting from its reliance on a representation that was made with the intent to deceive. *Britton v.. Price (In re Britton),* 950 F.2d 602, 604. "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* at 604. Moreover, as the United States Supreme Court explained in *Field,* a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts" for guidance on this issue. *Field,* 516 U.S. at 70, 116 S.Ct. at 443.

■ The Restatement (Second) of Torts (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss [to the credit card company]," § 546; and (2) legal causation, which requires a credit card company's loss to "reasonably be expected to result from the reliance." § 548A. In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani),* 967 F.2d 302, 306 (9th Cir.1992).

**IV. APPLICATION OF THE LAW**

■ Turning to the case at bar, the first issue that the Court must address is whether Bixel intended to repay the obligations that she incurred between July 11, 1996, and September 24, 1996. As set forth above, resolution of this issue necessarily requires an analysis of the twelve *Dougherty* factors. While Providian only addressed *Dougherty* factors one, four and five, the Court will address all twelve factors in seriatim. Bixel made the charges at issue approximately four to seven months before she filed her bankruptcy petition. Consequently, Providian is not entitled to the presumptions set forth in 11 U.S.C. § 523(a)(2)(C). Providian, nevertheless, argues that the number and amount

of charges made by Bixel during the previously indicated three month period were made in contemplation of bankruptcy. The Court disagrees.

Bixel explained that several of the charges made in mid-July and several of the charges made in late August were associated with trips that Bixel took. Bixel further explained that once she realized she was in financial trouble, she attempted to consolidate her debts so that she would only have one payment, and less creditors. To further her consolidation efforts, Bixel used her Providian card to payoff the following accounts[3]: (1) $3,411.64 on her Bank of America credit card, (2) $1,989.85 on her loan at Wells Fargo[4]; (3) $1,076.80 on her FCNB account; and (4) $166.52 on her Victoria's secret account. Bixel also testified that once these accounts were paid, Bixel did not use them again.

Bixel's testimony establishes that the charges and cash advances were not made in contemplation of bankruptcy. In addition, the Court finds that Bixel's charges and cash advances were not inconsistent with Bixel's prior use of her card.

With regard to the second *Dougherty* factor, Bixel admitted that she consulted with an attorney regarding her financial options in either September or October of 1996. However, the charges at issue were incurred in July, August and early September. Thus, the Court finds that Bixel did not consult with an attorney before she incurred the charges at issue. This finding is further buttressed by the fact that when Bixel met with her attorney, she was advised not to make any further payments on her credit card. Bixel testified that she heeded her

attorney's advice and ceased all payments. Since Providian's Exhibit 2 reflects that Bixel made a payment to Providian on October 4, 1996, the Court finds that Bixel did not meet with her attorney until sometime after that date.[5]

Next, neither the number of charges nor the amount of the charges made by Bixel from July 11, 1996, to September 24, 1996, were out of line in relation to Bixel's previous use of her Providian card. For example, from April 10, 1995, to June 6, 1996, Bixel made nineteen purchases with her Providian card and also made four cash advances in a two week period.

Thus, the red flag in this case is caused not by Bixel's purchases but rather by the cash advances that Bixel used to payoff other obligations. However, as Bixel explained, she was merely attempting to consolidate her obligations, with the hopes that it would be easier to make one payment as opposed to several. The Court finds this explanation quite logical. The Court also finds that neither the amount or the number of charges and cash advances made by Bixel indicate an intent to deceive.

Fourth, while Bixel concedes that her financial situation was out of control, Bixel intended to consolidate her obligations and re-gain control. Providian emphasizes this factor, arguing: "[I]t is clear that [Bixel] did not possess the financial ability to repay the debt to [Providian]. It is clear that [Bixel] overextended herself to unsecured creditors and [Bixel] did not have the income to meet her obligations she incurred for her credit charges with [Providian] and thus fraudulent [sic] misrepresented to Providian an intent

---

3. These amounts appear as cash advances on Bixel's monthly statements. Therefore, the Court refers to such charges as cash advances despite the fact that Bixel never actually obtained any cash from the transactions—balance transfers is perhaps, a more clear description.

4. Bixel had two separate accounts with Wells Fargo Bank. The first was a loan, which Bixel paid off with her Providian card. The second account was a line of credit which Bixel did not payoff. Thus, the Wells Fargo line of credit is listed on Schedule F of Bixel's schedules.

5. Alice Quinton from Providian testified that they attempted to contact Bixel three times in Novem-

ber of 1996 regarding her outstanding account balance. Providian first called Bixel on November 14, 1996, and left a message with a boy. Providian then phoned Bixel's home on November 26, 1996, and was told that Bixel had filed for relief under the Bankruptcy Code and that Providian should contact her lawyer—Mr. William J. Howell. However, it is clear from the record that Bixel did not file her bankruptcy petition until February of 1997. Due to the inconsistency, and the fact that this testimony does not contradict Bixel's testimony, the Court finds such statements are not credible.

and ability to repay." Plaintiff's Trial Brief, p. 6. In support of this argument, Providian referred to Bixel's schedules, which indicate that at the time Bixel filed her bankruptcy petition, she had $29,744.00 in credit card and credit line debt, and that the minimum monthly payments on such debt would be roughly $1,041.04. Providian argued that Bixel did not have the ability to make even the minimum monthly payments on the $29,744.00, because, as her schedules reflect, Bixel has monthly income, after taxes, of $3,156.00, Exhibit 3–Schedule I, and monthly expenses of $3,156.00, Exhibit 3–Schedule J.

The problem with this argument, however, is that it focuses solely on Bixel's ability, rather then intent, to repay. In addition, while Bixel may have been in a financially tight position, the Court does not find that Bixel was hopelessly insolvent—she was employed and Bixel's Schedule J—Current Expenditures of Individual Debtor—is sufficiently vague to make it impossible to determine whether Bixel made any provisions for her credit card and credit line debt. Furthermore, Providian did not press this issue on cross-examination of Bixel.

Fifth, while Bixel's actual charges and cash advances did not exceed the credit limit of $11,600.00, Bixel did incur finance charges and late fees that pushed her account balance over the limit, and by the time Bixel filed bankruptcy, her account balance exceeded her credit limit by $865.50. Had Bixel at least made minimal payments on her account, she could have easily prevented the account from exceeding the limit. Thus, this factor weighs in Providian's favor.

The Court finds that further discussion of *Dougherty* factor seven is not necessary as the factor was discussed with factors three and four. In addition, factor nine is not applicable to the instant case since Bixel was employed during the time that she incurred the charges at issue. The next *Dougherty* factor pertains to Bixel's financial sophistication. Bixel testified that she is not financially sophisticated and the Court finds such testimony credible in light of the fact that there was no evidence presented to indicate that Bixel has any type of financial training or background.

With regard to factor eleven, the Court has already alluded that there was not a sudden or unreasonable change in Bixel's buying habits. Moreover, under the circumstances, Bixel's cash advances were not unreasonable either. Although the Court has already determined that Bixel's charges were not out of the ordinary, the Court does not find it unreasonable to think that a debtor, experiencing financial difficulties, may actually incur slightly larger than normal charges shortly before filing bankruptcy—since credit cards may be an only source of funds to obtain necessities.

Finally, the *Dougherty* Court found it useful to examine the nature of the purchases. As discussed previously at great length, over one-half of the charges on Bixel's card were for cash advances to pay off other obligations, while the other purchases appear to be for food (e.g., California Pizza Kitchen), lodging (e.g., Courtyard by Marriott), clothing and/or home furnishings (e.g., Nordstrom and JC Penny). Providian did not challenge the nature of the charges and no testimony was offered as to whether the charges were for luxuries or necessities. Therefore, the Court finds that further discussion of this factor is not warranted.

After carefully considering the *Dougherty* factors and hence, the "totality of the circumstances," the Court finds that Providian has not established, by a preponderance of the evidence, that Bixel intended to maliciously and in bad faith incur credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. To the contrary, the Court finds that Bixel is one of those honest but unfortunate people who is entitled to relief under the Bankruptcy Code. Since Providian failed to sustain its burden of proof regarding the element of intent, the Court need not address the other elements of fraud, i.e., reliance and causation.

## V. CONCLUSION

Providian failed to establish, by a preponderance of the evidence, that Bixel did not intend to repay her obligations to Providian. Thus, Providian's complaint must fail. In

addition, since the matter of fees, pursuant to 11 U.S.C. § 523(d) is deemed waived, each party shall bear their own costs of suit.

IT IS ORDERED a separate Judgment shall be entered in favor of Defendant Patricia Bixel and against Plaintiff Providian Bancorp; and the Complaint to determine dischargeability of debt filed by Providian on May 15, 1997, is dismissed with prejudice.