**In re Constance P. MERCER, Debtor.**

**AT & T UNIVERSAL CARD SERVICES, Plaintiff,**

**v.**

**Constance P. MERCER, Defendant.**

**Bankruptcy No. 9608310SEG.**
**Adversary No. 960950SEG.**

United States Bankruptcy Court,
S.D. Mississippi,
Southern Division.

Feb. 26, 1998.

J. Mark Franklin, III, Bennett, Lotterhos, Sulser & Wilson, Jackson, MS, for Plaintiff.

Michael B. McDermott, Biloxi, MS, for Defendant.

## OPINION

EDWARD R. GAINES, Bankruptcy Judge.

Before the court for consideration is the complaint to determine dischargeability of

debt filed by AT & T Universal Card Services seeking exception from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) an indebtedness owed by the debtor, Constance P. Mercer, for credit card charges. Having considered the pleadings, the memoranda submitted on behalf of the parties and the evidence presented at trial, the court concludes that the relief sought should be denied and the debt should not be excepted from discharge.

## I. FINDINGS OF FACT

On April 23, 1996, Constance P. Mercer filed a petition for relief under Chapter 7 of the United States Code. AT & T Universal Card Services ("AT & T") subsequently filed its complaint to determine dischargeability of debt seeking an exception from discharge for credit card indebtedness in the amount of $3,284.64 plus interest, attorney's fees and costs.

In its complaint, AT & T alleged that the debtor, Constance P. Mercer, incurred charges on her credit card account with AT & T when she had no intention of repaying the indebtedness and with knowledge that she lacked the ability to repay, and that the charges were incurred with the intent to deceive the plaintiff. AT & T further alleged that the debtor opened her account on November 10, 1995, and within thirty-one days obtained fourteen cash advances totaling $2,829.23 including finance charges thereby using substantially all of the $3,000 credit limit.[1] The plaintiff further alleged that the debtor made only one payment on the account on January 30, 1996, in the amount of $25.00, and that finance charges caused the account balance to exceed the credit limit. Furthermore, the plaintiff alleged that the debtor's statement of financial affairs in her bankruptcy petition reflected gambling losses of $25,000 during the time in which the debtor obtained and used the credit account, and that the debtor had no income during the two years preceding the petition date. AT & T requested that the court except from discharge the indebtedness owed the plaintiff pursuant to 11 U.S.C. § 523(a)(2)(A) and that

judgment be entered. The debtor answered the complaint denying that the plaintiff was entitled to relief sought.

The parties submitted legal memoranda to the court on the issues and the matter was set for trial on October 24, 1997. A stipulation, dated October 24, 1997, was entered into between AT & T Universal Card Services and Constance P. Mercer and introduced as Exhibit C–1 at the trial and included the following stipulations:

1. The Plaintiff is a creditor of the Defendant and is the holder of an unsecured claim against the Defendant.

2. The Defendant filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on April 23, 1996.

3. This adversary proceeding is brought in connection with the Defendant's case under Chapter 7 of Title 11 in case number 96–08310–SEG now pending in this Court.

4. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157, § 1334, and 11 U.S.C. § 523.

5. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

6. The Defendant previously held a credit card issued by the Plaintiff.

7. The Defendant's credit card account with Plaintiff was opened on November 10, 1995, pursuant to a pre-approved credit application mailed to Defendant who completed, and signed it on or about September 25, 1995.

8. The Defendant received and used the credit card.

9. [omitted].

10. The Debtor made all credit purchases and obtained all case [sic] advances within thirty-one (31) days after the account was opened.

11. The foregoing items were the only charges ever incurred on the account. The debtor made no further charges to the account after December 11, 1995. Prior to

---

**1.** The billing statement on the account indicated credit purchases incurred in the amount of $357.59 and $2,765.96 in cash advances from November 18, 1995 to December 11, 1995.

incurring the charges, the previous balance owed on the account was zero.

12. The Debtor's credit limit on this account was $3,000.00. According to the Plaintiff's records, cash advances and finance charges, the Debtor exceeded the credit limit by $186.82. On the monthly statement of account for the billing period beginning January 16, 1996, AT & T instructed the Debtor to "refrain from using your AT & T Universal Card."

13. The Debtor made on [sic] payment of $25.00 on this account on January 29, 1996. The minimum payment due on or before January 9, 1996 was $253.82.

14. According to the Debtor's Statement of Financial Affairs on file with this Court, the Defendant lost approximately $25,000.00. The Debtor has further testified that her gambling losses were approximately $35,000.00 to $37,000.00 during the two years prior to the commencement of this case.

15. The Debtor was employed full-time during the year prior to commencement of this case. The Debtor reported gross annual income of $23,931.66 for 1995. In or about August 1995, the Debtor obtained additional part-time employment. On September 29, 1995, the Debtor's savings account had a balance of $151.04 which she withdrew, closing the account in or about October 1995.

16. According to the Debtor's Schedule of Affairs on file herein, at the commencement of this case, the Debtor was obligated to nine (9) credit issuers for $31,504.50, comprised in part of cash advances obtained for gambling within eighteen (18) months prior to commencement of this case.

17. The Debtor is familiar with credit card accounts and how obligations arise in connection therewith.

. . . .

At the trial on the matter, Ronald Lewis testified on behalf of AT & T Universal Card Services, stating that his job title at AT & T is "Bankruptcy Specialist." He stated that he acted as the liaison between 12 attorneys in 12 states in reviewing accounts on their cardmember base where bankruptcy had been filed to determine whether or not there might be anything on the account history that would indicate the possible need for more extensive review for adversarial type action. He also testified that he handled avoidable preference requests from trustees and other functions, and that he agreed that it was part of his duties to be familiar with the credit history of the customers who file bankruptcy.

Lewis testified that in 1996 approximately 87,000 AT & T cardholders filed for bankruptcy under Chapter 7 out of a total number of cardholders in 1996, the year this bankruptcy case was commenced, of approximately 18 million. He further testified that out of the 87,000 cardholders who filed bankruptcy in 1996, AT & T filed Section 523 actions in at least 3%, or about 2,700.

Lewis indicated that he was familiar with the process by which cardholders such as Mercer are screened for purposes of receiving the credit card solicitation. He stated that a solicitation is an offer of credit made to a prospective customer and that for a card to be issued the customer has to accept that offer and that the application is the offer. He further stated that they are required to solicit under the Fair Credit Reporting Act and that they are required to make a bona-fide offer of credit to anybody who has come through the screening in the solicitation process. Lewis then described the prescreening process undertaken by AT & T before a solicitation is sent out. He stated that the solicitation process runs 6 to 7 months before they actually mail the solicitation and that marketing determines what type of solicitation they are going to offer. He stated that they send a request to one of the three credit bureaus they utilize (Experion which is the old TRW, Equifax which is the old CBI and Trans Union) for a list of names meeting the criteria and the names are screened with the criteria established and sent back. He testified that the list of names is then referred to an outside vendor who processes against those people that have requested not to be solicited and also for duplicates names they may already have on the cardmember base. He also stated they check to see if any of the areas are in what they have learned to be

high fraud areas where people are attempting to obtain cards under false pretenses. He testified that the names are matched against the internal risk and scoring models that AT & T uses and names that do not make "the cut" are dropped from the list, and those retained are sent back to the credit bureau for a second screening to make sure there has been no change in the credit standing or credit history since the first review was done. Lewis testified that after the second screening the solicitation is sent out to the customer with the offering, and that if the customer returns it, it goes through a third screening or back end screen to determine there has been no deterioration in the credit history and risk scoring. He stated that at that time they would determine whether they will allow the original offer or whether there has been some type of deterioration in their credit history in which case they would offer a lower line or withdraw the offer. He said that the first screening for Mercer, the debtor here, was done through Trans Union. Lewis' testimony indicated that he would not be able to provide the information from the screening that was done in Mercer's case pointing out that it was done two years ago. He indicated that if a credit screening were to be done today through the credit bureau and another creditor wanted to make a report within a minute after the screening, the credit profile would change. Lewis testified that prior to the solicitation offer being sent to Mercer, the credit bureau information was reviewed. He stated that they rely upon their information to make the determination of these solicitations.

Lewis testified that normally an individual who had judgments, delinquent pay history or a bankruptcy on their credit would not even be solicited for an offer of credit. He stated that the credit bureau looks at total revolving debt, delinquencies, bankruptcies, judgments and that the bureau also looks at the utilization of existing credit and how much credit the customer has left. He stated further that they look at historical delinquencies over a 60 to 90 day period and that AT & T requires that at least one trade line has been updated within the past 24 months,

and that it is not an old credit line that has a dormant nature.

Lewis testified that there is a risk score that the credit bureau places on the client called a FICO score that predicts the probability of an account going delinquent 60 to 90 days or more in a year's period. He stated that factors taken into consideration include the length of time on the bureau, credit usage, and the number of accounts, and that it is an analysis of all the information on all the trade lines contained on that bureau rolled into a score. He agreed that the use of a FICO score is a common thing in the credit card industry. He indicated that the scores range from zero to 900 with the higher number being the better score. Lewis indicated that 680 is the minimum score AT & T requires as a condition for sending out a solicitation offer to a prospective customer, and that Mercer's FICO score at the time of the solicitation letter was 735. He stated that he would evaluate this as a very good FICO score.

Lewis testified that once the solicitation process is completed, if the customer is approved pursuant to Fair Credit Reporting, AT & T will mail a required offer of credit to the customer and it will indicate what credit line is being offered and will give them the option to complete the application and return it by mail or to advise by phone of their acceptance of the application. He stated that Mercer's application was returned by mail and that she accepted the credit card offer.

The evidence established that Mercer filled out the credit application, or solicitation offer, providing an income figure of $24,500, a social security number, a date of birth, a home and business phone number and a maiden name, and that she signed and dated it September 25, 1995, and that this was the extent to which AT & T inquired of her as to her financial situation. There were no questions asked about where she worked, her financial condition, how many children she had or whether she was married. Lewis testified that the information was basically a reinforcement of the information they had obtained from the prior screenings in the six months prior to mailing the solicitation to the customer, and indicated that AT & T had

performed an evaluation of this particular prospect's creditworthiness.

Lewis further testified that the credit limit issued to Mercer when the card was issued would have been $3,000, and that the income listed on her application was $24,500. He stated that it was not uncommon for a person with an income of $24,500 to receive a credit line of $3,000. Lewis indicated that the FICO score does not consider income as a factor because the income is not normally reported on the credit bureau and that is why they ask for the income on the solicitation. He stated that what the FICO considers is the history and the way that the prospective customer is performing with their existing creditors that they have already established.

Lewis indicated that the issuance of a credit card was not the end of the screening process. He stated that on a quarterly basis they automatically run their accounts through a credit bureau screening to see how they are handling other credit lines and indicated they would already know how the customer is or is not performing on his AT & T account. He stated that if the FICO score drops below the 680 threshold it could result in a complete discontinuance of the cash side of the card, a lowering of the credit line, or termination of charge privileges. Lewis indicated that this automated process is performed on every cardholder at least four times a year. He indicated that factors looked at in the process include trade lines, delinquencies, and an updated FICO score. He stated that if there is no indication of changes on their credit bureau to indicate adverse problems and nothing on their account to show such things as slow pay, no pay, or non-sufficient fund checks, then things would stay status quo, depending on the infractions, and how severe they were. Lewis indicated that the quarterly reviews were done with regard to Mercer's account. Lewis further testified that the cardmember agreement is mailed when the customer is mailed their actual credit card, setting forth terms and conditions of the account, and that Mercer would have been sent a cardmember agreement with her card.

In addition, Lewis testified that on November 19, 1995, an entry was made on the account memo for Mercer's account indicating that through a FALCON report the account had been flagged because of an excessive number of transactions on the account particularly since first usage. He indicated that the FALCON program, FALCON being an acronym, is a computer program to monitor accounts for excessive activity not only to protect the customer but also to help sometimes in the area of fraud. He stated that when an account is reviewed, the associate doing the review has the option, if the transactions seem excessive to the point of high dollar or anything else, to freeze the account until he can contact the customer and verify he or she made the charges. He further stated that if they reviewed the report and felt there were charges that were not overly excessive to thousands of dollars or things of that nature that they have the right to clear the account for further use. Lewis testified that the associate that did the review on Mercer's account cleared the account and did not block it as overly egregious. He indicated that the associate would have reviewed the charges, and would have seen they were numerous and were apparently all within the same time frame and felt there was not an issue for alarm at that point. Lewis testified that there is nothing in their cardholder agreement that says a customer cannot use an ATM and that if they're not exceeding their limit they could use the card. He stated they have no control over the ATM's and agreed that as long as the user of the card is within the cardmember agreement AT & T is obliged to honor the agreement.

Lewis further testified that the account memo showed that on January 23, 1996, a promise to pay the amount of $100 was obtained from Mercer, when telephoned, with an indication that the payment would be received by February 1, 1996. He further stated that an entry was made on January 26 indicating that the collections department called and verified address and phone numbers, and educated Mercer on the status of the account, meaning the delinquency level, over limits, amount due, and amount past due, and indicated a promise to pay. He said that the memo also stated that the customer

was trying to get a second job to bring the account current, and that a change of address was received. Lewis indicated that AT & T did not receive a $100 payment by February 1st as promised and that the only payment they ever received on the account was a $25 payment. Lewis further testified that the account memo showed an entry dated January 30, 1996, coded "LSLS" which means a past due letter would have been sent to the customer. He further indicated that a February 2, 1996, entry showed that an attempt was made to place a call to Mercer's residence but there was no answer, and that on February 5, 1996, a call was made to Mercer's business number. He stated that they spoke with her and again educated her on the status of the account, meaning that it was delinquent, and that she stated there was a lot of expense, she was trying to get caught up and that she didn't know when she could mail another payment. He stated that they advised about being past due and advised that when accounts are due 31 days or above they start adversely reporting to the credit bureau. He further stated that a February 6 entry on the account showed that an automatic dialer system tried to call the residence and there was no answer. Lewis testified that the next entry on the account was on February 12 and showed that notification was received from Mercer that she was filing Chapter 7 bankruptcy.

Lewis was questioned about other credit card debt that appeared on the debtor's bankruptcy schedules in the amount of $31,504.50, and testified that he had determined that the other credit cards were acquired between March 1995 and December 1995, with one opened in December of 1995, and that the account with AT & T was opened November 10, 1995.

Lewis agreed, when questioned, that the screening processes done on Mercer, including the third one, and the FICO score of 735, told AT & T that she was a good credit risk, and admitted that at the time AT & T made the decision to send her a card they had no information that she had anything other than good intent regarding payment of the charges. Additionally, Lewis was questioned about what facts he saw in her duplicate account statements regarding the use of her card that would lead him to believe she lacked the requisite intent to repay the debt and Lewis indicated that the only thing that indicated the possible intent when he reviewed it was the fact of the location where the cash advances were taken, namely in the casinos. Lewis further indicated that the use of the casino ATMs constituted probably about 20% of Mercer's intent. He stated that the biggest factor that raised the flag in his mind was that the card was maxed out through a combination of cash and non-cash charges, roughly 32 or 36 transactions in a 30 day period, that there was no payment made until they called the customer and the amount received was by far less than the minimum. When asked whether this 80% was intent formed after this was already accomplished Lewis responded in the affirmative.

Constance Mercer, the debtor herein, testified that she had $35,000 to $37,000 of gambling losses in the two years prior to filing for bankruptcy. She also testified that she really intended to repay the credit cards, and that it would have depended at least in part on gambling winnings. She testified that the first year or two she gambled she won more than she lost. Mercer's testimony further indicated that she opened 7 accounts from March to December of 1995. She stated that one of the uses of the cards was for cash advances for gambling. She stated that the cards were obtained within 12 months of the bankruptcy and that she did not talk to a bankruptcy attorney until 60 days after she last used her credit card. She stated that it was 6 months between the card charges and the filing of her petition in bankruptcy. She testified that she was able to pay the minimum payments on her debts in November of 1995 but between then and April she lost more than she won. She stated that she never intended not to pay the debts. She testified that she was experienced in her employment as a paralegal. She stated that she did not consider the charges to be out of the ordinary and that she did not intentionally go over the credit limit. She further testified that she had thought she was financially sophisticated.

Mercer's testimony further indicated that she had used money from gambling to gamble and had paid bills with her salary and was not having difficulty paying bills in the beginning and had no problem for a year or more because she was winning. She further indicated that she started getting all these credit cards and that she started having trouble paying on the accounts at the end of 1994 or beginning of 1995. She stated that the first time she made less than the minimum payment was at the end of 1995 and that AT & T was the first. She stated that as of October 1995 she was not able to pay debts as they became due from income from working and that she was also using winnings to pay debts.

## II. CONCLUSIONS OF LAW

The matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. §§ 1334, 157 and 523.

Section 523(a)(2)(A) of the Bankruptcy Code provides for exception from discharge of certain debts owed by a debtor as follows:

11 U.S.C. § 523, Exceptions to discharge.

(a) A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . .

11 U.S.C. § 523(a)(2)(A).

▉▉▉ To prevail on its claim for nondischargeability, the creditor must establish the elements required for Section 523 by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir.1995). Exceptions to discharge are construed strictly against creditors and in favor of a fresh start

for honest but unfortunate debtors. *See*, *F.C.C. National Bank v. Cacciatore (In re Cacciatore)*, 209 B.R. 609 (Bankr.E.D.N.Y. 1997); *AT&T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D.Ill.1996); *AT&T Universal Card Services Corp. v. Feld (In re Feld)*, 203 B.R. 360 (Bankr.E.D.Pa.1996); *Providian Bancorp v. Bixel (In re Bixel)*, 215 B.R. 772 (Bankr. S.D.Cal.1997); *Colonial National Bank USA v. Leventhal (In re Leventhal)*, 194 B.R. 26 (Bankr.S.D.N.Y.1996); *Sears, Roebuck and Co. v. Hernandez (In re Hernandez)*, 208 B.R. 872 (Bankr.W.D.Tex.1997).

▉▉▉ Regarding the necessary elements that must be proven to establish an exception to discharge, the court in *Sears, Roebuck and Co. v. Hernandez (In re Hernandez)*, 208 B.R. 872 (Bankr.W.D.Tex.1997) stated the following:

To define the necessary elements of a § 523(a)(2)(A) action, the Fifth Circuit has distinguished between actual fraud on the one hand and false pretenses and representations on the *other*. *RecoverEdge* at 1292. "In order for a debtor's representations to be a false representation or false pretense under § 523(a)(2), it 'must have been: (1)[a] knowing and fraudulent falsehood [ ], (2) describing past or current facts, (3) that [was] relied upon by the other party.' " *Id.* at 1292–93 (changes in original) (quoting *In re Allison*, 960 F.2d at 483). Actual fraud, in contrast, requires the creditor to prove that: "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained losses as a proximate result of the representations." Id. at 1293 (footnote omitted) (quoting *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr.W.D.Ky.1986)); *Federal Deposit Ins. Corp. v. Smith (In re Smith)*, 133 B.R. 800, 805 (N.D.Tex.1991).

208 B.R. at 875.[2]

Although the complaint filed by AT & T did not make a specific distinction as to

---

**2.** In *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284 (5th Cir.1995), the Fifth Circuit noted that, "Oth-

whether relief sought pursuant to Section 523(a)(2)(A) was based on false pretenses or false representation or whether it was based on actual fraud, the brief submitted by AT & T actually refers to each. However, since there are common elements to the separate actions, the court's discussion will generally focus on the individual elements required rather than the separate actions under Section 523(a)(2)(A).

■ To establish the proof necessary to except the indebtedness owed by Mercer from discharge, AT & T must show that it *relied* on the debtor's representations. In accordance with *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), that reliance must be actual and it must be justifiable:

> The question here is what, if any, level of justification a creditor needs to show above mere reliance in fact in order to exempt the debt from discharge under § 523(a)(2)(A). The text that we have just reviewed does not say in so many words. While § 523(a)(2)(A) speaks of debt for value "obtained by ... false pretenses, a false representation, or actual fraud," it does not define those terms or so much as mention the creditor's reliance as such, let alone the level of reliance required.

*Id.* at 66, 116 S.Ct. at 441–42. The Court further stated the following:

> Since the District Court treated Man's conduct as amounting to fraud, we will look to the concept of "actual fraud" as it was understood in 1978 when that language was added to § 523(a)(2)(A). Then, as

now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required. *Id.,* § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.,* § 540 ... "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.,* § 545A Comment b. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experi-

er circuits have applied a uniform standard resembling our 'actual fraud' standard to all debts failing under § 523(a)(2)(A)." *Id.* at 1293, n. 18 (citations omitted). In the more recent case of *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326 (Bankr.W.D.Mo. 1997), the court noted that, "The United States Supreme Court recently held that section 523(a)(2)(A) encompasses common law representation or actual fraud. This approach confirms the approach taken by the *Alvi* court, which held that the three torts are all subject to the single action test of actual fraud." *Id.* at 333 (footnotes omitted). However, it is unnecessary for the court to determine which standard is applicable here in that some of the elements required for actual fraud and for false pretenses or false representation are elements in common, and there-

fore, can be considered together. Each contains a reliance element, as stated in *Hernandez,* 208 B.R. at 875, which if not met, results in a failure to meet the burden of proof. Furthermore, although there may be some question as to whether the justifiable reliance standard required for proof of an action for actual fraud is also the standard required for an action for false pretenses or false representation, in either case there must be reliance in fact, or actual reliance, or the action will fail. *See, Field v. Mans,* 516 U.S. 59, 71 n. 8, 116 S.Ct. 437, 444 n. 8, 133 L.Ed.2d 351 (1995); *Sears, Roebuck, and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872, n. 4 (Bankr.W.D.Tex.1997); *AT&T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724, 730 (Bankr.N.D.Ill.1996).

enced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." *Id.,* § 541, Comment a.

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

516 U.S. at 70–71, 116 S.Ct. at 443–44. (footnotes omitted). *See also, Sears, Roebuck and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872 (Bankr.W.D.Tex.1997); *Household Credit Services, Inc. v. Walters,* 208 B.R. 651 (Bankr.W.D.La.1997); *AT&T Universal Card Services Corp. v. Totina (In re Totina),* 198 B.R. 673 (Bankr.E.D.La.1996); *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326 (Bankr.W.D.Mo.1997); *Providian Bancorp v. Bixel (In re Bixel),* 215 B.R. 772 (Bankr. S.D.Cal.1997); *F.C.C. National Bank v. Cacciatore (In re Cacciatore),* 209 B.R. 609 (Bankr.E.D.N.Y.1997); *Chevy Chase Bank, FSB v. Briese (In re Briese),* 196 B.R. 440 (Bankr.W.D.Wis.1996).

The court in *AT&T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr.N.D.Ill.1996) stated that "[T]he justifiable reliance test focuses on the subjective qualities of the creditor, which necessarily includes the creditor's level of sophistication and expertise." *Id.* at 731 n. 11 (citations omitted); *See also, AT&T Universal Card Services v. Wilson (In re Wilson),* 1997 WL 795884 (Bankr.W.D.Tenn.1997) (Supreme Court's adoption of justifiable reliance requires a subjective analysis of each case's facts and circumstances). Additionally, the court in *Alvi* indicated that, "[B]efore embarking on an analysis of whether the creditor acted justifiably, the Court first must be sure that the Creditors proved they actually relied on representations of the Debtor." *Id.* at 730–31. In *Sears, Roebuck and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872 (Bankr.W.D.Tex.1997), the court noted the following:

A party required to demonstrate a specific level of reliance must at least demonstrate actual reliance. For example, the *Field* court would not even reach the question of whether the creditor's reliance was "justifiable" had the creditor not relied at all. Similarly, if the standard is reasonable reliance, we could not determine whether the creditor had acted reasonably in relying on the debtor's representations had the creditor failed to examine any of the representations. Thus, the sine qua non of all reliance claims is reliance in fact.

Bare reliance has recently been defined by District Judge Sidney Fitzwater as, "a causation-type element in a fraud claim. If a party does not rely on a fraudulent representation, the representation cannot be said to have produced an injury to be remedied." *Federal Deposit Insurance Corp. v. Smith (In re Smith),* 133 B.R. 800, 806 (N.D.Tex.1991); *see also* BLACK'S LAW DICTIONARY at 1160 (5th ed.1970) (defining reliance as a "belief which motivates an act").

Id. at 876–77.

In determining whether there was actual or justifiable reliance by AT & T in this case, it becomes important to focus on the point in time at which any such reliance took place, if at all, whether at the time of the initial issuance of the card, or when the card was used in subsequent credit transactions. In the case of *Household Credit Services, Inc. v. Walters,* 208 B.R. 651 (Bankr.W.D.La.1997), the court made the following observations:

Consequently, in credit card cases, the plaintiff must establish justifiable reliance upon the debtor's representations when such representation is made, which, as stated above, may occur either when the credit card was issued or when the particular charge was made. This proof, however, must be related to actions and conduct of the plaintiff, not of the defendant.

Proof of justifiable reliance on representations made when the card is issued may be satisfied when the plaintiff comes forth with proof of the circumstances surrounding the issuance of the card, such as, the issuer's procedures for reviewing the application, including the method of review of the applicant's creditworthiness. In instances where pre-approved cards are issued, however, card issuers apparently desire to avoid the considerable expense of determining creditworthiness prior to the issuance of the card, and spew the cards

out basically upon getting the party's name, address, and some scant information about employment (if any is obtained at all). Issuers obviously have made a business decision regarding credit inquiries at the inception of the relationship.

This decision is surely a function of cost ... Until such time as the losses attributable to bankruptcy approach or exceed the cost of determining creditworthiness at time of issuance, the court believes issuers will continue to issue pre-approved cards without any inquiry into the cardholder's ability to repay the charges to be incurred by use of the card. The losses they sustain are merely part of their inventory, just as fresh vegetables are to the grocer—each realizes that part of their inventory will be lost, the grocer to spoilage and the card issuer to bankruptcy. Recognizing this inevitability, each makes sure the price they charge will more than make up for such loss in order to attain the anticipated level of profit.

. . .

If the issuer was justified in relying upon the debtor's creditworthiness at the time the card was issued, a presumption arises that the issuer is justified in continuing to rely thereon throughout the relationship, unless some event occurs, i.e., the debtor exceeds his credit limit, which occurrence would remove the presumption of continued justifiable reliance.

208 B.R. at 654.

The court in *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr.W.D.Mo.1997), made the following comments regarding credit scoring in the initial screening for pre-approved cards:

In fact, Ms. Ellingsworth received a credit score, which was acceptable to LICS, at a time when, according to her bankruptcy schedules, the credit bureau report, and the information sheet from Consumer Client Counseling, her expenses exceeded her income by at least $500 a month.

Credit scoring reflects the practice of targeting individuals who use many credit cards and pay the minimum amount each month, rather than paying off their balance. Mr. Carter testified that a minimum payment on UCS's card is 2.1 percent of the outstanding balance each month. Surely UCS understands that customers with excess disposable income would not choose to make minimum payments leaving balances that incur interest in excess of 15 percent per annum. Offering this customer a pre-approved card, without making any individual inquiry into her financial status, is the equivalent of buying a horse with one eye. If the credit card issuers choose to continue this profitable technique to increase their customer base, they cannot claim that they justifiably relied upon any representation the customer made at the time the card was issued. In other words, a creditor cannot justifiably rely on any representation, or the absence thereof, made by a card holder if the card was pre-approved, and no direct financial information was obtained by the issuer. Moreover, if UCS did not justifiably rely upon Ms. Ellingsworth's representations at the time the card was issued, reliance cannot then attach when the card is used. I find, therefore, that the credit in this case was extended to Ms. Ellingsworth without justifiable consideration of her ability to repay. If UCS did not consider her ability to repay, it certainly cannot now claim that it relied on her intent. Indeed, to hold otherwise only encourages creditors to continue to act irresponsibly. At the time debtor used the card, the only information UCS had obtained was the debtor's credit score as of a year before, her income, and her employment. Thus, UCS made the loan to a debtor without consideration of her assets, her secured debt, or her other living expenses. Surely a bank that made an unsecured loan to a customer without obtaining such basic information could not be said to have justifiably relied on the debtor's representation that she intended to repay the debt. The issue, then, is whether a credit card company is entitled to more favorable treatment than a lender in a face to face transaction with a debtor.

*Id.* at 338–39 (footnotes omitted).[3] The court also made the following comments regarding the issuance of credit cards:

> Since credit cards are so profitable, and the profits derive from having a very large customer base, issuers such as UCS may choose to ignore the usual standards of credit worthiness. Additionally, the creditors actively seek out undisciplined spenders who carry large unpaid balances from month to month. They dangle large credit lines in front of these consumers, and offer come-ons like lower interest rates for the first few months, as well as pre-printed cash advance checks. Some banks have even started to penalize customers who pay their accounts in full each month. In their eagerness to capture market share, banks spend little time gathering financial information about their potential credit card customers. Prior to a mass mailing, creditors such as UCS obtain lists from credit bureaus with the names of candidates and a "credit score" for each person on the list. These scores relate generally to past card use, whether the candidate pays the minimum monthly balance on current cards, and whether there are any delinquencies or bankruptcies on record. Car loans, medical bills, and mortgages are not included in the credit score, nor are income, job history, marital status, and assets.
>
> The credit score, which can range from 450 to 850, is a supposedly scientific way of assessing the likelihood that a debtor will repay a loan. The computer credit model upon which most lenders rely today was developed by Fair, Isaacs, and Company in California. The score is based on all credit-related data in a credit bureau report, but is not a measure of a borrower's income, assets, or bank accounts. Fair Isaacs, which is the service that UCS uses, identifies credit patterns, each of which corresponds to the probability that a lender will make payments ... By Mr. Carter's own admission it is more efficient for UCS to rely on a credit score than to acquire specific information about a potential customer prior to offering the customer a credit card. In other words, as long as you use a credit card instead of a financial statement to obtain an unsecured loan, you do not have to indicate any form of credit-worthiness, other than the fact that, until now, you have paid your bills on time. Unfortunately, this tactic guarantees that borrowers who are encouraged to use credit cards until they acquire unsecured debt that far exceeds their income will ultimately not be able to pay their bills on time.
>
> Banks use other techniques as well to encourage consumers to keep large balances on their credit cards. For example, VISA and MASTERCARD issuer Citibank offer credit cards that give a 2 percent interest rate break to customers who keep a balance of more than $2,500. UCS, the plaintiff here, rewards customers with bonus points if they carry a large balance. More disturbing, credit card companies flood college campuses with sign-up tables to hook customers early in adulthood. It is not unusual for college students with no income at all to accumulate 10 to 15 cards while in college.

*Id.* at 330–31.

■■■ The evidence showed that prior to and subsequent to the issuance of the AT & T credit card to Mercer, several investigations and evaluations of Mercer's credit-worthiness were conducted by AT & T. Mercer never solicited the credit card from AT & T; never knew of nor gave her permission for the investigations; and was never asked one thing about her debts, gambling losses, financial condition, or other credit cards being used by her or the balances thereon. Those clandestine investigations and inquiries showed her to be a perfect credit card prospect for AT & T and served as the *sole and only basis* for AT & T's unilateral business decision to pre-approve her for its credit card. AT & T *solely relied* on its own agents and investigative processes to make its decision. The evidence reflects nothing written,

---

**3.** The references to "UCS" in the quotation from *Ellingsworth* are to AT & T Universal Card Services.

said or done by Mercer upon which AT & T relied at any time while the charges were being made.

The court concludes that without the establishment of reliance on the debtor's representations at the time the card was issued, reliance will not attach to the representations, if any, made by the debtor with the subsequent use of the card. Under the circumstances of this case, where the credit card was pre-approved, based solely on AT & T's screening process, performed through various credit bureaus and the FICO score, there was no actual reliance by AT & T on representations made by the debtor. In fact, the only representation by the debtor at the initial stage of card issuance appeared on the "solicitation" card and related only to her income, name and signature, social security number, phone number, date of birth and mother's maiden name. Mercer answered each requested item accurately and honestly. AT & T's decision to extend credit was a pre-approved decision. The proof did not establish that the debtor's representation of her income was even factored into the decision to extend credit at all, since even the amount of the credit line to be extended was determined prior to the debtor's honest disclosure of her income on the solicitation or application. Moreover, the statement by the debtor as to her income would generally be considered a statement respecting the debtor's financial condition and would not qualify under Section 523(a)(2)(A) as an actionable representation.

Any reliance that AT & T may have had on representations regarding the debtor at the time of issuance of the card was not, in fact, reliance on representations by the debtor at all, but on representations by the credit bureau or its own internal screening procedures. Moreover, those representation were obviously incomplete as to the debtor's overall financial picture and true creditworthiness. Additionally, such information regarding the debtor's financial condition would be precluded from the type of representation that is actionable under § 523(a)(2)(A).

The court concludes that there was no actual reliance on any representation of the debtor at the time of issuance of the pre-approved credit card from AT & T. Even if it were to be assumed that there was reliance, the court would not consider such reliance to have been justifiable in light of the incomplete nature of the credit information obtained by AT & T. Furthermore, AT & T appeared to have sanctioned charges made on Mercer's account when the FALCON report was issued and the continued use of the account was approved with a decision that there was no cause for alarm. Any claim, at this point, that the use was excessive or charges too numerous would not be justifiable under the circumstances. Since there was no justifiable reliance by AT & T at the time the card was issued, there was no continuing reliance to attach to the subsequent credit card transactions.[4] The court concludes that AT & T has failed to establish by a preponderance of evidence that it justifiably relied on false representations made by Mercer.[5] In the absence of sufficient proof

4. See, *Household Credit Services, Inc. v. Walters,* 208 B.R. 651 (Bankr.W.D.La.1997); *Sears, Roebuck and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872 (Bankr.W.D.Tex.1997); *Providian Bancorp v. Bixel (In re Bixel),* 215 B.R. 772, 1997 WL 771090 (Bankr.S.D.Cal.1997); *Anastas v. American Savings Bank (In re Anastas),* 94 F.3d 1280 (9th Cir.1996); *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326 (Bankr.W.D.Mo.1997); *F.C.C. National Bank v. Cacciatore (In re Cacciatore),* 209 B.R. 609 (Bankr.E.D.N.Y.1997); *AT&T Universal Card Services Corp. v. Feld (In re Feld),* 203 B.R. 360 (Bankr.E.D.Pa.1996).

5. The court does not necessarily conclude that the element of reliance cannot be established in a case where a pre-approved card was issued but where there was a substantial period of time, in

which the debtor used the card in accordance with the terms of the cardmember agreement and made prompt payments and was able to establish a good credit history with the creditor. *But see, Household Credit Services v. Walters,* 208 B.R. 651 (Bankr.W.D.La.1997) (although debtors had history of normal payments on credit cards, proof did not show reliance at time of issuance). However, no determination is made by the court on this issue since the facts of this case do not establish such a credit history between Mercer and AT & T. The card was only used for 31 days, an insufficient period of time to establish a credit history of any type of creditworthiness, and at that point the credit limit had already been exceeded. The court's conclusion is limited to the facts of this case where a pre-approved revolving credit charge card was issued without reliance on initial representations by the debtor and proof

of reliance, the creditor cannot sustain its burden of proof under Section 523(a)(2)(A) for an action based on false pretenses, false representation, or on actual fraud. On this basis, AT & T's request for exception from discharge should be denied and the debt should be discharged. In light of this conclusion, the court finds it unnecessary to make determinations regarding the other elements required under § 523(a)(2)(A).

If AT & T feels that Mercer did something improper by using cash advances to gamble, it is interesting to note that AT & T was fully aware that the major cash withdrawals were being made from the ATM machine at the Isle of Capri Casino in Biloxi, Mississippi. The computer at AT & T clearly and instantly reported that information as shown on the monthly billing statements to Mercer.

If AT & T does not want its cardholders to use cash advances for gambling purposes and wants such uses to be non-dischargeable, why not put a specific restriction on this use in the cardholder agreement? This court is unaware of any law which would prohibit this minor addition to the extensive terms of said agreement.

The court finds that the position of the creditor, AT & T, was not substantially justified. Therefore, pursuant to 11 U.S.C. § 523(d) the debtor is awarded a judgment against the plaintiff for her costs and a reasonable attorney's fee.

A judgment will be entered consistent with these findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58. This opinion shall constitute findings and conclusions pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

where no subsequent credit history was established upon which reliance could even have arguably been placed.