In re Michael W. SAGAN, Debtor.

Alan J. FLEMING, Plaintiff,

v.

Michael W. SAGAN, Defendant.

Bankruptcy No. 97–42275.
Adversary No. 97–4092.

United States Bankruptcy Court,
W.D. Missouri.

March 18, 1998.

---

**14.**  Ex. # 11, Attachment C.

Bruce Strauss, Kansas City, MO, for Plaintiff.

Tracy Robinson, Kansas City, MO, for Defendant.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Plaintiff Alan Fleming is an attorney who previously practiced in Kansas City, Missouri. Debtor/defendant Michael Sagan is an attorney who has and continues to practice in Kansas City, Missouri. This action arises out of an agreement between the parties to split a contingent fee. Upon collection of the fee, Mr. Sagan failed to remit to Mr. Fleming his portion of the fee. This action is brought pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that Mr. Sagan has an obligation to Mr. Fleming, and that that obligation is nondischargeable. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### A. Statement of Facts

Plaintiff Alan Fleming has been a member of the Missouri Bar since 1978, specializing primarily in personal injury litigation. In 1995, he was retained to represent Terrence Anderson in a workers compensation claim. Mr. Anderson had been a driver for Consolidated Transfer and Warehouse Company, Inc. (CTW). While driving a truck for CTW in California, Mr. Anderson was involved in a rear-end collision. As a result of the accident, he is a quadriplegic, and his wife, who was a passenger in the truck at the time, was killed.

Mr. Fleming successfully represented Mr. Anderson in his workers compensation claim. He then advised Mr. Anderson that his two children, Sally Anderson and Lloyd Rex Anderson, might have a cause of action against Mr. Anderson's employer for the wrongful death of their mother. At the time of the accident Sally Anderson had reached the age of majority, but Rex Anderson had not. Rex did become eighteen, however, before the filing of the lawsuit. Thereafter, Mr. Fleming researched various aspects of California law, in part by contacting a lawyer in that state. For example, he researched spousal and family immunity, as well as the standards for contributory negligence. He also researched California law prohibiting an employee truck driver from carrying nondriver passengers. In addition, he obtained the police report and a video tape of the scene. Mr. Fleming testified that he spent approximately 15 to 20 hours in this prelimi-

nary evaluation of the case, and based on his experience determined that the case had a value of approximately $200,000.00 on an early settlement.

After conducting the preliminary evaluation, Mr. Fleming advised Mr. Anderson that he could not file a lawsuit on behalf of the children. Mr. Fleming had determined that Mr. Anderson himself should be an additional defendant in the case and, since he had represented Mr. Anderson in the worker's compensation claim, he would not represent his children in a suit against him. In addition, Mr. Fleming at this time was in the process of winding down his law practice and moving to Florida, where he now resides. As a result of all these factors, Mr. Fleming contacted debtor/defendant Michael Sagan, to whom he previously had referred one or two cases. Mr. Fleming advised Mr. Sagan of the research and analysis he had conducted, and he asked Mr. Sagan to take the case. The parties agreed that Mr. Sagan would receive 40 percent of the contingency fee if the case was settled prior to trial and 50 percent if the case was tried. Mr. Fleming would receive the balance of the fee.

Mr. Fleming then arranged a meeting with Mr. Anderson, his two children, and Mr. Sagan, at Mr. Anderson's home. The purpose of that meeting was to introduce Mr. Sagan to the children, to explain that Mr. Fleming had a conflict, and to suggest that they retain Mr. Sagan to handle the case. Mr. Fleming led the discussion at the meeting regarding his conflict. He testified that he explained the conflict to the Andersons, informed them that he would receive a part of the fee in the event of a recovery, and advised them that they were free to contact a lawyer other than Mr. Sagan, if they chose to do so. Mr. Fleming testified that the Andersons decided to retain Mr. Sagan, so Mr. Fleming produced the form contract that he used in personal injury cases. According to Mr. Fleming, he gave the contract to Mr. Sagan, who filled it out and had the Anderson children sign it. By this time both Sally and Rex Anderson were over eighteen years old. Neither party produced a copy of

Mr. Fleming's form contract at trial, and Mr. Sagan denies that any such contract was signed at all.

The meeting with the Andersons was held sometime in March of 1995. Thereafter Mr. Sagan testified that he did legal research on the statutes of limitations for wrongful death actions, in both California and Missouri. On April 29, 1995, Rex and Sally Anderson signed separate Contracts of Employment which had been prepared by Mr. Sagan.[1] The contracts made no reference to Mr. Fleming.

According to Mr. Fleming, Mr. Sagan periodically came by his office to talk about cases which had been referred to him, to solicit other referrals, and to socialize. In the course of one of those meetings, Mr. Sagan raised a question as to whether Mr. Fleming could collect a fee from the Andersons' case, given his conflict of interest. Mr. Fleming responded that he was ethically permitted to share in the fee, and he told Mr. Sagan that the "Hyatt" case established that proposition. On May 19, 1995, Mr. Fleming memorialized the split negotiated by the parties in March of 1995 by writing out the terms of the arrangement on his letterhead. Both Mr. Fleming and Mr. Sagan signed the agreement.[2]

In early May of 1995, without informing Mr. Fleming, Mr. Sagan contacted Gregory Grounds, an experienced trial attorney in Kansas City, and asked Mr. Grounds to act as lead counsel in the litigation. Mr. Sagan told Mr. Grounds that the case had been referred to him by another lawyer who had a conflict. Mr. Sagan did not tell Mr. Grounds the name of the other attorney or, more pertinently, that he had agreed to share his fee with that other attorney. Mr. Sagan and Mr. Grounds agreed that any fee received by them would be split 50/50. Mr. Grounds then took the lead in preparing the petition, which both he and Mr. Sagan signed. The petition was filed in mid-May of 1995.

In addition to being an experienced trial attorney, Mr. Grounds was a partner in a

---

1. Def. Ex. ## 1 and 2.

2. Pl. Ex. # 1.

partnership, which owned the building where Mr. Sagan had his office.

Thereafter Mr. Fleming asked Mr. Sagan whether the lawsuit had been filed, and Mr. Sagan assured him that it had. On a number of occasions Mr. Fleming asked for a copy of the petition, but Mr. Sagan never sent it to him. Had he seen the petition, he, of course, would have discovered that Mr. Grounds had somehow become involved in the case. After the lawsuit was filed, Mr. Fleming continued to take an interest in the case. He testified that he had perhaps 15 or 20 conversations with Mr. Sagan after May 1, 1995, and that Mr. Sagan never advised him that Mr. Grounds had been brought into the case. Mr. Fleming also spoke with counsel for the insurance carrier that was handling the defense of the case. He advised Mr. Sagan of these conversations with defense counsel. Mr. Fleming had been under the belief that the case could be settled quickly, before too much expense was incurred, and at some point became impatient with the lack of progress.

In April, 1996, Mr. Fleming spoke with Mr. Sagan, and attempted to determine what steps had been taken to prosecute the case. Mr. Fleming became concerned because Mr. Sagan was not able to tell him what steps had been taken, nor what conversations he had had with the insurance company regarding settlement. Mr. Sagan still did not advise Mr. Fleming that it was Mr. Grounds who was negotiating with defense counsel. Mr. Fleming testified that at that time he offered to reduce his fee if the case were settled quickly, as an incentive to Mr. Sagan to get to work on the case.

This is Mr. Sagan's second Chapter 7 bankruptcy case. The first case was filed on November 7, 1995, after the lawsuit had been filed on behalf of the Anderson children, but before a settlement had been reached. At the Section 341 Meeting of Creditors in the first bankruptcy, the Chapter 7 trustee asked Mr. Sagan to provide information as to any contingent fee contracts, or accounts receivable, due his law practice. It was the trustee's position that the right to any such fees was an asset of the bankruptcy estate and should, when collected, be turned over to the trustee. This case apparently represented one of the few, if not the only, contingent fee case pending at that time. In response to that request, Mr. Sagan proceeded to have the first bankruptcy case dismissed.

In approximately May, 1996, Mr. Grounds negotiated a settlement of the case with defense counsel for the sum of $75,000. Mr. Sagan's contract with the Anderson children entitled him to 40 percent of any recovery, or a fee of $31,000. That fee was paid to Mr. Grounds, who was entitled, under his agreement with Mr. Sagan, to 50 percent, or $15,500. By that time, Mr. Sagan was approximately $12,000.00 in arrears in rent due and owing to Mr. Grounds' partnership. Therefore, Mr. Grounds and Mr. Sagan agreed that Mr. Grounds would keep Mr. Sagan's share of the fee as payment for rent due, as well as for rent to come due in the future.

Mr. Fleming next spoke to Mr. Sagan in late July of 1996. At that time, Mr. Sagan advised him that there was an offer to settle the case. Sometime during the fall of 1996, Mr. Fleming attempted to contact Mr. Sagan again on a number of occasions, but Mr. Sagan did not return his calls. At that point, Mr. Fleming contacted defense counsel, who advised him that the case had been settled in May or June of that year. Mr. Fleming once again called Mr. Sagan, who admitted that the case had been settled, that he had been paid his fee, and that he did not believe he owed Mr. Fleming anything. Mr. Sagan contended that, due to an ethical conflict, Mr. Fleming was not entitled to any fee, and, according to Mr. Sagan, it would be unethical of him to share his fee with Mr. Fleming. In addition, Mr. Sagan advised Mr. Fleming that he was filing bankruptcy anyway, and that any obligation owed to Mr. Fleming would be discharged in the bankruptcy.

Mr. Sagan contends that there are two reasons for his nonpayment of the obligation due Mr. Fleming. First, he contends that he discovered in April of 1996, that the obligation was "not legal", because Mr. Fleming did no work on the file. Second, he contends that he did not pay the debt because he simply did not have the money.

Mr. Fleming testified that after their initial conversation in 1995 concerning the legality of the fee split, which led to the signing of the May 19, 1995 Agreement, Mr. Sagan never mentioned that he believed the Agreement was illegal. And, never, prior to settlement of the case, did Mr. Sagan advise Mr. Fleming that he did not intend to honor the Agreement.

Mr. Sagan filed this second Chapter 7 case on June 18, 1997.

I note initially that Mr. Fleming filed this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6), however, at trial he produced evidence only as to the section 523(a)(2)(A) Count. As to that Count, there are two issues to decide. The first issue is whether Sally and Rex Anderson waived any conflict Mr. Fleming had, otherwise, he is not entitled to collect a fee. As part of the waiver issue, I must find that they were fully informed that Mr. Fleming and Mr. Sagan had entered a fee-splitting arrangement. Only if Rex and Sally Anderson understood that Mr. Fleming had a conflict, and that Mr. Fleming and Mr. Sagan had a fee-splitting arrangement, is the fee-splitting arrangement between Mr. Sagan and Mr. Fleming ethical and enforceable. If the arrangement is enforceable, there is a debt, and I reach the dischargeability issue.

### LEGAL CONCLUSIONS

#### A. CONFLICT OF INTEREST AND WAIVER

■ It is not disputed that a conflict of interest existed in this case. Mr. Anderson, as the driver of the vehicle at the time of the accident, would have to be a defendant in any wrongful death cause of action brought by the children. Mr. Fleming, in fact, testified that he perceived a conflict, and that this was one reason for referring the case to Mr. Sagan. Missouri Supreme Court Rule 4, Rules of Professional Conduct (MRPC), Rule 1.7 states the general rule concerning the representation of a client by an attorney for

whom a conflict of interest exists. Save for limited exceptions, MRPC 1.7(b) forbids the representation of a client if a conflict of interest exists:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected;

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.[3]

Mr. Fleming testified that he believed the inclusion of Mr. Sagan in the case eliminated any adverse effect on the Anderson children. As to waiver, he stated that the purpose of the meeting in late March of 1995 between Mr. Sagan, Mr. Fleming, Mr. Anderson and the two Anderson children was to inform the Anderson children of the conflict and introduce them to Mr. Sagan. Mr. Fleming testified that at that meeting the Anderson children gave oral consent to waiver of the conflict. Mr. Sagan verified that the meeting did take place, but he did not testify as to whether Mr. Fleming informed the children of the conflict. Neither the Anderson children nor Mr. Anderson testified at the hearing. I find that Mr. Fleming informed the children of the conflict, and that they orally waived it.

Thus, the issue becomes whether oral consent to waive the conflict meets the requirements of MRPC 1.7(b). The Missouri Court of Appeals has held that oral consent is enough to remedy a conflict of interest.[4] In *Henderson*, a criminal defendant gave an oral waiver of a conflict of interest where the defendant's attorney represented both her

3. MRPC 1.7(b).

4. *Henderson v. State*, 734 S.W.2d 254, 258 (Mo. Ct.App.1987) *citing Harris v. State*, 609 S.W.2d

723, 724 (Mo.Ct.App.1980); *Davis v. State*, 573 S.W.2d 736, 737 (Mo.Ct.App.1978).

and a co-defendant.[5] The court held that "[s]uch informed consent remedies any apparent conflict of interest." [6] Therefore, the oral consent given by the Anderson children was sufficient to waive the actual conflict of interest.

## B. FEE SPLITTING

■ That is not the end of the case, however. Alan Fleming and Michael Sagan also negotiated a fee-splitting arrangement. I must now decide if the fee-splitting arrangement is enforceable under the MRPC.

Among other requirements, MRPC 1.5(e) requires consent from the client before two or more attorneys can enforce a fee-splitting arrangement:

> (e) A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;
>
> (2) the client is advised of and does not object to the participation of all the lawyers involved; and
>
> (3) the total fee is reasonable.[7]

Alan Fleming testified that he put in fifteen to twenty hours of work on this case before referring it to Michael Sagan. Mr. Fleming's testimony was that most of this time was spent on researching the statutes of limitations issues in both California and Missouri and included phone conversations with attorneys in California. No record of the time Mr. Fleming spent working on the case before he referred the matter to Michael Sagan was introduced into evidence. Neither Michael Sagan nor Gregory Grounds offered any testimony as to how much time they spent on the case. Since Mr. Sagan and Mr. Grounds did not refute Mr. Fleming's

claim that he provided at least 60 percent of the services, part 1 of Rule 1.5(e) is satisfied.

Part 2 of Rule 1.5(e) requires proof that the client is made aware that more than one lawyer is involved, and that all lawyers will share in the fee.[8] Mr. Fleming testified that he informed Sally and Rex Anderson at the meeting in March of 1995 that when and if the suit was successful he would receive a portion of the fee. Mr. Sagan never refuted that testimony.

The comments to MRPC 1.5(e) state that clients do not need to be informed of the amount of the fee split, but that they must be informed that there is a fee split. There is no requirement in Missouri that the information be in writing. Rule 1.5(e) does require a written agreement if lawyers want to assume joint responsibility for the representation.[9] But, there is no requirement for a writing to prove that a client is advised that a fee-splitting arrangement exists.[10]

■ The ABA Model Code section from which Rule 1.5 is adapted is Disciplinary Rule (DR) 2–107(A). The rule provides:

> A Lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his firm or law office, unless:
>
> (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
>
> (2) The division is made in proportion to the services performed and responsibility assumed by each.
>
> (3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.[11]

When DR 2–107 is either the law in a state or state law has been derived from DR 2–107, a fee-splitting arrangement that occurs without the consent of the client is unenforceable.[12] But the Model Code section

---

5. *Id.* at 256.

6. *Id.* at 258.

7. MRPC 1.5(e).

8. MRPC 1.5(e)(2).

9. *Id.* at 1.5(e)(1).

10. *Id.* at 1.5(e)(2).

11. ABA Model Code DR 2–107(A).

12. *See e.g. King v. Housel,* 52 Ohio St.3d 228, 229–230, 556 N.E.2d 501, 504 (1990); *In re Fox,* 327 S.C. 272, 293, 490 S.E.2d 265, 268 n. 9 (1997); *In re Confidential,* 670 A.2d 1343, 1345 n. 4 (D.C.1996); *Anderson v. Anchor Org. for*

from which Missouri adapted Rule 1.5 does not require disclosure of a fee-splitting arrangement to be in writing.[13]

Mr. Fleming testified that he disclosed to Rex and Sally Anderson, in the presence of Mr. Sagan, that there was a conflict and that he would receive a fee in the event of recovery. Mr. Sagan never refuted that statement, nor did he call either of the Anderson children as witnesses to refute that statement. The only evidence before this Court is that Mr. Fleming's actions were in compliance with MRPC 1.5(e). I, therefore, find the Rex and Sally Anderson did not object to the fee-splitting arrangement after it was disclosed to them, and, thus, the arrangement is enforceable. As a result, Mr. Sagan is indebted to Mr. Fleming in the amount of $18,600.

## C. EXCEPTIONS TO DISCHARGE PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a debt for money to the extent the debt was obtained by false pretense, false representation or actual fraud.[14] The United States Supreme Court recently held that section 523(a)(2)(A) actual fraud is common law misrepresentation.[15] To prove actual or common law fraud, a creditor must prove the following:

(1) the debtor made a false representation;

(2) at the time the representation was made the debtor knew it was false;

(3) debtor subjectively intended to deceive the creditor at the time he made the representation;

(4) the creditor justifiably relied upon the representation; and

(5) creditor was damaged.[16]

While case law makes much of these five elements, most cases turn on whether a debtor intended to repay an obligation at the time it was incurred,[17] and whether the creditor justifiably relied on debtor's representation that he intended to repay.[18] Direct proof of an individual's actual intent and purpose is almost impossible to prove.[19] However, in this case Mr. Sagan admitted that he did not intend to pay Mr. Fleming any portion of the fee. He gave a number of reasons for that intent. He claimed it would have been unethical to pay Mr. Fleming because he had a conflict of interest; he claimed he did not have the money; he claimed the debt is dischargeable in bankruptcy anyway, and he intended to file bankruptcy. Aside from the bold testimony that he did not intend to pay Mr. Fleming, his actions can certainly be construed to demonstrate that fact as well. He made an arrangement with Mr. Fleming to give him 60 percent of any recovery, if the case settled without a trial. And then he made an arrangement with Mr. Grounds to give Mr. Grounds 50 percent of any recovery. He could not have intended to honor both agreements, even if he intended to work on the case without fee for himself. Moreover, Mr. Sagan did not dispute Mr. Fleming's testimony that Mr. Sagan did not tell him the case had settled, and, in fact, indicated it had not. For all of these reasons, I find that Mr. Sagan did not intend to share the fee with Mr. Fleming, even though he signed an Agreement to do so.

I also find that Mr. Fleming justifiably relied upon Mr. Sagan's representation. He testified that he had referred other

---

*Health Maintenance,* 274 Ill.App.3d 1001, 211 Ill.Dec. 213, 222, 654 N.E.2d 675, 684 (1995); *Villa v. Heilmann,* 162 Vt. 543, 649 A.2d 768, 771 (1994); *Polland & Cook v. Lehmann,* 832 S.W.2d 729, 736 (Tex.App.1992); *Ryder v. Farmland Mutual Insurance Co.,* 248 Kan. 352, 807 P.2d 109, 115 (1991); *Watson v. Pietranton,* 178 W.Va. 799, 364 S.E.2d 812, 814 (1988).

**13.** ABA Model Code DR 2.107(A).

**14.** 11 U.S.C. 523(a)(2)(A).

**15.** *Id.,* (*citing Field v. Mans,* 516 U.S. 59, 70–72, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995)).

**16.** *AT & T Universal Card Services v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326, 333 (Bankr. W.D.Mo.1997); *AT & T Universal Card Services Corp. v. Feld (In re Feld),* 203 B.R. 360, 364 (Bankr.E.D.Pa.1996).

**17.** *Id.* at 366; *Chevy Chase Bank v. Briese (In re Briese),* 196 B.R. 440, 449 (Bankr.W.D.Wis. 1996).

**18.** *Field v. Mans,* 516 U.S. 59, 70–72, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995).

**19.** *Ellingsworth,* 212 B.R. at 334.

clients to Mr. Sagan, and that they had shared fees in the past. He took the precaution of reducing the Agreement to writing, and he attempted to follow the course of the case, going so far as to contact defense counsel himself. I also must note that Mr. Sagan is an Officer of the Court. He is a licensed attorney. He willingly signed his name to an Agreement with a fellow professional. I find Mr. Fleming was justified in relying on that Agreement. Therefore, I find that Mr. Sagan intended to deceive Mr. Fleming, and did, in fact deceive Mr. Fleming. I find further that Mr. Fleming justifiably relied upon the deception. I find, therefore, that Mr. Fleming was entitled to a portion of the fee in the amount of $18,600, and that the debt is nondischargeable.

An Order in accordance with this Memorandum Opinion will be entered this date.